

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-20-1998

# United States v. Nunez-Vasquez

Precedential or Non-Precedential:

Docket 96-5779,96-5780

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"United States v. Nunez-Vasquez" (1998). *1998 Decisions.* Paper 116.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/116

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 20, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NOS. 96-5779 and 96-5780

UNITED STATES OF AMERICA,
Appellee

v.

LUIS RICARDO NAVARRO, a.k.a
"Lucho", and PORFIRIO NUNEZ-VASQUEZ,
Appellants

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Cr. No. 93-588)

Argued: January 21, 1998

Before: BECKER, STAPLETON, Circuit Judges and
FEIKENS, District Judge*

(Filed May 20, 1998)

        SARAH E. HUNTER, ESQUIRE
         (ARGUED)
        400 West Maple Road, Suite 3000
        Birmingham, MI 48009

Attorney for Appellant Porfirio Nunez-
Vasquez

_____

*Honorable John Feikens, United States District Judge for the Eastern
District of Michigan, sitting by designation.

JOHN C. WHIPPLE, ESQUIRE
  (ARGUED)
Whipple, Ross & Hirsch, P.A.
9 Campus Drive
Parsippany, NJ 07054

Attorney for Appellant Luis Ricardo
Navarro

FAITH S. HOCHBERG, ESQUIRE
United States Attorney
AMANDA HAINES, ESQUIRE
  (ARGUED)
Assistant United States Attorney
970 Broad Street
Newark, NJ 07102

Attorneys for United States of
America

OPINION OF THE COURT

FEIKENS, District Judge.

I. Introduction

In this appeal, the central issue is whether S1956(a)(1) of Title 18 ("Laundering of monetary instruments") sets forth three separate offenses, each of which could be a basis for criminal conviction, or three alternative mental states, any of which being posssessed by a defendant would violate the statute.

II. Background

Luis Ricardo Navarro ("Navarro") and Porfirio Nunez-Vasquez ("Nunez") were charged by indictment 1 with, inter alia, one count of conspiracy in violation of 18 U.S.C. S1956(g) (Section 1956(g) has since been renumbered as S1956(h)). The object of the charged conspiracy was money laundering in violation of 18 U.S.C. S1956(a)(1).

_____

1. Other counts in the indictment are not relevant to the issues raised in this appeal.

2

Count 1 of the indictment charged defendants with

> knowing that the property involved in the financial
> transaction represented the proceeds of some form of
> unlawful activity, and (A) with the intent to promote
> the carrying on of the specified unlawful activity, that
> is, the distribution of narcotics, and (B) knowing that
> the transaction was designed in whole or in part to
> conceal or disguise the nature, location, source,
> ownership, and control of property believed to be the
> proceeds of specified unlawful activity, and (C) knowing
> that the transaction was designed in whole or in part
> to avoid a transaction reporting requirement under
> State or Federal law, did conspire and agree with one
> another to conduct and attempt to conduct a financial
> transaction which in fact involved the proceeds of
> specified unlawful activity, specifically the transfer,
> delivery, and other disposition of United States
> currency in excess of $12,000,000 that was the
> proceeds of the distribution of narcotics, contary to
> Title 18, United States Code, section 1956(a)(1).

Count 3 of the indictment charged that defendant Nunez,
and others, did

> knowingly, willfully, and with the intent (A) to promote
> the carrying on of specified unlawful activity, that is,
> the distribution of narcotics, (B) to conceal or disguise
> the nature, location, source, ownership, and control of
> property believed to be the proceeds of specified
> unlawful activity, and (C) to avoid a transaction
> reporting requirement under State or Federal law,
> conspire and agree with one another to conduct and
> attempt to conduct a financial transaction, specifically
> the transfer, delivery, and other dispostion of United
> States currency represented by a law enforcement
> officer and by another person at the direction of and
> with the approval of a Federal official authorized to
> investigate and prosecute violations of Title 18, United
> States Code, Section 1956, to be the proceeds of
> specified unlawful activity, that is, the distribution of
> narcotics, contrary to Title 18, United States Code,
> Section 1956(a)(3).

3

In violation of Title 18, United States Code, Section 1956(g).

In 1992, the government began an investigation into a money-transmitting business known as "Latino Envios," located in Union City, New Jersey. It also operated under the name "Lacino Travel." Latino Envios apparently had a relationship with "Richard," L.N.U., a money launderer connected to the Colombian Cali drug cartel. Latino Envios was managed by Robert Foti, who had a relationship with Richard, and, at Richard's direction, he established a branch office in San Juan, Puerto Rico. At that location, Foti and his wife Rosario hired defendant Nunez to run the Puerto Rico office at a salary of $700 a week. Defendant Navarro is alleged to be the brother of Richard and acted as one of his representatives in dealing with the Foti organization. On several occasions, Navarro delivered money to Foti and Nunez in Puerto Rico and New York. These cash deliveries were large, $500,000 or more. The deliveries were typically made during early morning hours or at night. The money would be taken by couriers in cars and the deliveries were made in garages, motel rooms, or fast-food parking lots. Nunez admitted to U.S. Customs Agent Jose Pena that he concluded that the money he processed was derived from drugs.

After being counted by Nunez, Foti, or both, the money was then deposited in various banks, including Eurobank or Banco Bilbao, as well as other banks in the United States. Thereafter, the money was converted into checks, made out to a predetermined payee, or wire transferred to other banks, in accordance with instructions from Navarro or Richard. Between July 6, 1993 and December 10, 1993, fourteen monetary transactions, totaling $5,256,004, took place in Puerto Rico.

At trial, government investigator George Serrano testified that a confidential informant told Nunez that he would be dealing with narcotics proceeds. Moreover, Foti had told Nunez that all involved had to be careful. In the Puerto Rico office, Nunez had arranged for blankets to be hung on the walls so that conversations about the funds involved could not be heard by those in adjoining offices.

4

At trial, telephone conversations were introduced in which there were constant references to code words and slang, which Foti described as repeated efforts to conceal that the talk was about narcotics proceeds. He gave a detailed description of the money laundering scheme in which co-conspirators would write checks against accounts into which they had deposited cash drug proceeds and direct those checks to payees whose indentities did not matter as long as the payee was one of a group of payees selected by drug dealers. He testified that Navarro told him that Navarro was moving money for a family business, and that Navarro's father's position was that if people in the United States wanted to use drugs, the Navarro family was not responsible for their actions.

The indictment was handed down in December 1993. Foti pleaded guilty in May 1994. Nunez and Navarro went to trial in November 1994. Nunez was convicted of conspiracy to commit money laundering of drug proceeds in violation of Title 18, U.S.C., S1956(g) (now (h)), Count 1, and conspiracy to commit money laundering with funds represented by a law enforcement officer to be proceeds of narcotics distribution in violation of Title 18, U.S.C., S1956(g) (now (h)), Count 3.

Navarro was also found guilty on Count 1 of the indictment, Title 18, U.S.C., S1956(g) (now (h)).

III. Statement of the Issues Presented by this Appeal:

(1) whether the government's opening and closing statements, which focused on one of three possible intended objectives of the money laundering conspiracy, constructively amended the indictment;

(2) whether the district court correctly charged the jury on unanimity; and

(3) whether there was sufficient evidence viewed in the light most favorable to the government to support Nunez's conviction for conspiring to launder drug proceeds.

5

IV. Analysis

Title 18, U.S.C., S1956, entitled "Laundering of monetary instruments," states:

> (a)(1) Whoever, knowing that the property involved  in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity --
>
> (A)(i) with the intent to promote the carrying on of specified unlawful activity, or
>
> (ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or
>
> (B) knowing that the transaction is designed in whole or in part --
>
> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or
>
> (ii) to avoid a transaction reporting requirement under State or Federal law, shall be sentenced to afine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

Title 18, U.S.C., S1956(h), states:

> Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

Issue 1 – Whether the government's opening and closing statements, which focused on one of three possible intended objectives of the money laundering conspiracy, constructively amended the indictment.

During her opening statement, the prosecutor discussed the evidence that she would present, and she alluded to the charges in the indictment. She emphasized the distinction

6

between money laundering and currency transaction reporting requirements, and she explained that "[t]he Judge will give you instructions at the end of the case concerning exactly what elements you need to find in each of those violations, and I can't and won't try to steal his thunder in that regard." Nonetheless, she remarked, "Very briefly, money laundering is the knowing conducting of afinancial transaction knowing that that cash comes from an illegal source, one of which is narcotics, and intending to conceal or disguise the source of those funds." She later reiterated that "I am not going to try to tell you now all of the elements that the Government must prove with respect to [Count 1]."

Before closing arguments, the court briefly summarized each count of the indictment and generally described the notion of conspiracy. It then addressed the specific elements of money laundering, explaining that the defendants must have

> acted either, (A) with the intent to promote the carrying on of specified unlawful activity, or (B), knowing that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the proceeds of specified unlawful activity, or (C), knowing that the transaction was designed in whole or in part to avoid a transaction reporting requirement under state or federal law.

In her summation, the prosecutor returned to the elements of money laundering, explaining as follows:

> I am not going to go through all three of [the subsections on knowledge and intent in the money laundering statute] because I think that is not necessary. One of those should suffice. I am going to read you that one, that the defendant acted knowing that the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds [of] specified unlawful activity, knowing, that is, that the transaction was designed to conceal the source of the funds.

7

The defendants argue that the government's opening and closing statements narrowed the indictment by focusing on one of three possible alternative mental states -- knowing concealment -- and the court's presentation of the full indictment to the jury, allowing conviction on any one of the three possible alternative mental states, violated their right to due process. This argument was not raised at trial; therefore, we will review the court's submission of the money laundering instruction for plain error in accordance with United States v. Olano, 507 U.S. 725 (1993). Under this standard, there must be (1) an error; (2) which is clear or obvious; and (3) which affects substantial rights (i.e., it affected the outcome of the district court proceedings). See United States v. Olano, 507 U.S. 725, 733-34 (1993). Because Rule 52(b) is permissive, we only correct a plain error which (a) causes the conviction or sentencing of an actually innocent defendant, or (b) seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings. Id. at 735-36; United States v. Stansfield, 101 F.3d 909, 920 (3d Cir. 1996).

We need not proceed any further than the first element of the plain error test -- we find that the court committed no error by presenting a money laundering instruction making reference to all three alternative mental states. It did not thereby impose a "constructive amendment" to the indictment. A constructive amendment occurs when the defendant is deprived of his "substantial right to be tried only on charges presented in an indictment returned by a grand jury." United States v. Miller, 471 U.S. 130, 140 (1985) (quoting Stirone v. United States, 361 U.S. 212, 217 (1960)) (internal quotation marks omitted). The defendants here were tried on an indictment that clearly set out the offense for which they were ultimately convicted, and the indictment was never constructively amended at any point before, during, or after trial.

We reject the defendants' argument that the prosecutor's opening and closing remarks focusing on knowing concealment narrowed the charge to only that one mental state. The prosecutor clearly stated that she was not going to address each of the three possible alternative mental states in her opening and closing remarks. She carefully

8

avoided conveying an intent to narrow the charge, and it would not have been reasonable for the defendants to rely on the government's statements as notice of an intention to narrow the indictment. Accordingly, the indictment was never narrowed, the district court's charge to the jury cannot be viewed as having expanded it, and the indictment was therefore not constructively amended.

Issue 2 – Did the district court correctly charge the jury on unanimity?

Defendants contend that the district court erred by failing to instruct the jurors that they must unanimously decide which of the alternative mental states set forth in S1956(a)(1) defendants possessed. As noted above, to constitute a violation of the statute the defendant must undertake a financial transaction involving proceeds known to be from a specified unlawful activity:

> 1) With the intent to promote the carrying on of a specified unlawful activity (the promotion prong); or

> 2) Knowing that the transaction was designed in whole or in part to conceal the nature, location, ownership, etc. of the proceeds (the conceal or disguise prong); or

> 3) Knowing that the transaction was designed to avoid a transaction reporting requirement under state or federal law (the reporting requirement prong).

Although defendants were charged with possessing all three mental states (the indictment was written in the conjunctive), the jury was instructed in the disjunctive:

> The third element of the offense which the Government must prove is satisfied by any one of three alternatives: The Government must prove beyond a reasonable doubt either that the defendant acted with the intent to promote the carrying on of specified unlawful activity or that he acted knowing that the transaction was designed, in whole or in part, to conceal or disguise the nature, the location, the source, the ownership or control of the proceeds, or that he acted knowing that the transaction was designed in whole or in part to

9

> avoid a transaction reporting requirement under state
> or federal law.

The jury was not told specifically that it must unanimously decide which mental state each defendant possessed.

Defendants argue that S1956(a)(1) actually creates three separate offenses for promotion, concealment, and avoidance of reporting requirements -- as opposed to setting forth a single offense which can be violated by any one of the three mental states. Accordingly, they contend that the district court should have specifically instructed the jury that it must unanimously decide which mental state they possessed. Although the district court gave the jury a general unanimity instruction, its failure to provide this specific instruction, defendants maintain, requires a reversal because the instructions given create a risk of a patchwork verdict. That is, if the defendants are correct, and S1956(a)(1) sets forth three different offenses, then the lack of a specific unanimity instruction could yield a guilty verdict even though all twelve jurors did not agree on which provision of S1956(a)(1) was violated. The government counters that S1956(a)(1) does not create multiple offenses, only alternative mental states, and therefore the risk of a patchwork verdict is illusory.

Put differently, defendants' challenge is to the district court's characterization of S1956(a)(1) as a single crime, as to which the verdict need not be limited to any one statutory mens rea alternative. Defendants did not raise this objection to the jury charge at trial. Thus, we review for plain error.

A. Schad and Edmonds

Our analytic point of departure on this issue is Schad v. Arizona, 501 U.S. 624, 111 S.Ct. 243 (1991). The defendant in that case was convicted under an Arizona statute which defined first-degree murder as being either (a) willful, deliberate, or premeditated, or (b) committed in the course of certain felonies. See Schad, 501 U.S at 628. The state court determined that the statute defined only one crime, and that, therefore, the jury need not unanimously decide which of the two options (a felony murder or a premeditated

10

murder) had occurred. The Supreme Court affirmed, with a four-Justice plurality rejecting the defendant's contention that the trial court erred by not requiring the jury to unanimously agree on a single theory of first-degree murder.

The plurality held that when a criminal statute provides alternative routes to a conviction, whether jurors must be unanimous with respect to a particular route is dependent on two questions. First, did the legislature intend to create different offenses or different means for violating a single offense? Second, if the legislature intended to create different means for violating the same offense, is that statutory definition constitutional under the Due Process Clause? See Schad, 501 U.S. at 632-33, 636-37, 640. Applying this approach, the plurality found that the Arizona legislature's intent to create a single offense with alternative mental states was clear, and that this definition of first-degree murder did not offend due process. The Court's due process inquiry looked to history and wide practice as guides to fundamental values, as well as to narrower analytic methods of testing the moral and practical equivalence of alternative means of satisfying an element of an offense. Schad, 501 U.S. at 637.

We expounded upon and applied the first prong of the Schad framework in United States v. Edmonds, 80 F.3d 810 (3d Cir. 1996) (en banc).[2] In that case we analyzed whether the three predicate crimes required to establish a violation of the Continuing Criminal Enterprise ("CCE") statute, 21 U.S.C. S848, were intended to be treated as different means or different offenses -- in other words, whether the jury must unanimously decide which three predicate acts were committed. Since the text and legislative history of the CCE statute offered little guidance on Congress' intent, we set forth a set of background interpretive principles to guide

_____

2. We noted in Edmonds our doubt over the usefulness of the legislative intent prong of Schad. See 80 F.3d at 818 n.10. We expressed a preference instead for an inquiry into whether the differences between the statutory alternatives are so important that the lack of jury agreement as to a specific alternative casts too much doubt on the accuracy of the verdict. Id.

11

our application of Schad's legislative intent prong. Those principles are:

> 1) The historical tradition in criminal jurisprudence that a jury verdict represents substantial agreement on a discrete set of (actions occurring at a single place at some specific time;

> 2) Constitutional considerations suggesting that we should construe Congress' intent so as to avoid grave and doubtful constitutional questions;3 and

> 3) The rule of lenity, counseling that the degree of jury unanimity required is important enough a protection that we hesitate to interpret an ambiguous statute to require less, rather than more, unanimity.

Id. at 818-821. Based on these principles, we concluded in Edmonds that when a statute combines formerly distinct offenses into a single crime as predicate offenses, we should assume that Congress intended the formerly distinct offenses to retain their offense status with its attendant unanimity requirements. Id. at 822.4

B. Application of Schad and Edmonds – Legislative Intent

Our threshold inquiry is to determine whether Congress intended to create separate offenses or separate means of committing the same offense when it drafted the alternative mental state provisions of the money laundering statute. This inquiry, like our inquiry in Edmonds, is made difficult by two facts. First, the intent of Congress cannot be readily inferred from the face of the text of S1956. Second, the legislative history is similarly unhelpful, as no relevant congressional reports were submitted with the original enactment of the statute in 1986.

---

3. We identified two primary considerations to be assessed under this prong: first, whether there is a historical analogue for interpreting the statutory alternatives as different means of committing a single offense; and, second, the Schad plurality's belief that different means must reflect notions of equivalent blameworthiness or culpability. See Edmonds, 80 F.3d at 819-20.

4. We also held that harmless error review could apply in this context. See Edmonds, 80 F.3d at 824.

12

1. Case Law Guidance

Although the legislative history is unavailing, other cases have suggested how we should construe Congress' intent behind S1956(a)(1). The case that speaks to this issue most directly is United States v. Holmes, 44 F.3d 1150 (2d Cir. 1995). There, the defendant was charged with two separate counts of violating S1956, S1956(a)(1)(B)(i) (the conceal or disguise provision) and (ii) (the reporting requirements provision), arising out of the same underlying misconduct. The court in Holmes rejected the argument that the same financial transaction could give rise to two separate crimes under these provisions:

> We cannot accept the government's implicit contention that the same financial transaction gives rise to separate crimes simply because the defendant, at the time he deposited the money, knew that what he was doing -- the prohibited conduct -- was designed for two unlawful purposes: concealing proceeds and avoiding reporting requirements. The statute punishes the conducting of a financial transaction with guilty knowledge. Having knowledge of two improper purpses rather than one does not multiply the offense of a single financial transaction into two offenses.

Id. at 1155. Accordingly, the court concluded that

> given the language of S1956, congress must be deemed to have intended only a single punishment for each transaction even though the defendant may have had two improper purposes in mind.

Id. at 1155-56. We note, however, that this conclusion was based only on the court's reading of the text of the statute; the opinion does not cite to any legislative history or other texts influencing its decision.

Although not with the clarity of Holmes, other circuits have reached the same essential result. In United States v. Brown, 944 F.2d 1377 (7th Cir. 1991), for example, the U.S. Court of Appeals for the Seventh Circuit considered a set of factual circumstances similar to the present case. The indictment charged that the defendant violated both the promotion and conceal or disguise subsections of

13

S1956(a)(1), but the government's proof and argument, as well as the trial court's instructions, only discussed the conceal or disguise alternative. The court held that "[t]he possibility that the jury nevertheless based its verdict on the [promotion prong] ... though troubling in the abstract, is not fatal to the conviction ...." Id. at 1387.

Although Brown appears to support the alternate means interpretation of S1956, the Seventh Circuit was clearly uncomfortable with that result:

> [W]e renew our caution ... that the government should in the usual case charge defendants under one prong of the statute or another as it will be the rare case in which the government will be able to prove that a single transaction was intended to promote an illegal activity and conceal the origin of the funds used in that activity.

Id. While this statement demonstrates some pause on behalf of the court, it does not undermine the Seventh Circuit's basic conclusion that Congress intended that the jury could be instructed in the disjunctive. See also United States v. Alford, 999 F.2d 818, 824 (5th Cir. 1993) (rejecting without discussing, under plain error standard, defendant's claim that specific unanimity instruction is required in indictment for violation of subsections (a)(i) and (B)(i)).

We have not clearly weighed in on this question. Defendants point us to two cases which they contend reflect a belief that Congress intended the S1956 alternatives at issue to be treated as separate offenses. They rely principally on United States v. Paramo, 998 F.2d 1212 (3d Cir. 1993). There, the defendant was convicted of five counts of violating subsection (A)(i) (the promotion alternative). Although not charged with violating subsection (B)(i) (or, for that matter, (B)(ii)), Paramo contended that the trial court had erred by failing to instruct the jury that they could not convict him under S1956(a)(1)(A)(i) if they found him guilty under S1956(a)(1)(B)(i). Paramo, 998 F.2d at 1218, n.3. We rejected this claim in the margin, noting that "contrary to Paramo's suggestion, a finding of guilt under subsection (B)(i) is not a defense to a prosecution under

14

subsection (a)(i)." Id. at n.3. Defendants contend that the Paramo footnote stands for the proposition that a defendant could be prosecuted separately under the promotion and concealment subsections, and that the Paramo panel must have concluded that Congress intended those subsections to be treated as separate offenses.

In our view, the Paramo footnote is insufficiently clear to compel a reversal here on a plain error standard of review. The proposition that Paramo rejected is that a jury could not convict a defendant under subsection (A)(i) if they found him guilty under subsection (B)(i). As noted above, Paramo stated that a finding of guilt under subsection (B)(i) is not a defense to a prosecution under subsection (A)(i). This footnote admits of two possible readings. It could mean either that the (A)(i) prosecution would not be barred on double jeopardy grounds -- which would imply that (A)(i) and (B)(i) are separate offenses with distinct elements -- or simply that a S1956(a)(1) defendant cannot defend the charge that he intended to promote an unlawful activity by claiming that he actually intended only to conceal or disguise the proceeds from that activity. In other words, a finding of intent to conceal under subsection (B)(i) is not inconsistent with a finding of intent to promote under subsection (A)(i). If Paramo means the latter, then its holding would be entirely consistent with the view that S1956(a)(1) sets forth separate means of committing a single offense.

In light of the fact that Paramo was not charged with violating subsection (B)(i), and had not (at least as appears from the opinion) been charged with a (B)(i) violation based on the same conduct in the past, we are hesitant to conclude that the panel in Paramo was reaching out to decide a novel double jeopardy issue (without any discussion) which was not squarely before it. Moreover, we believe that the second interpretation of the Paramo footnote -- which need not be predicated on afinding that Congress intended to create separate offenses -- is more plausible. We recognize, however, that the import of Paramo is unclear. Since we are reviewing the defendants' conviction for plain error, though, we are not persuaded that the Paramo footnote itself satisfies defendants' burden

15

under Olano of demonstrating that Congress clearly intended S1956(a)(1) to create three separate offenses.

Unlike Paramo, defendants' second case, United States v. Conley, 37 F.3d 970 (3d Cir. 1994), is not of much moment. Conley only states that to violate S1956(a)(1), the transaction must be committed with the intent either to promote the specified unlawful activity or to conceal the nature and source of the income. Id. at 978. This certainly is an accurate statement, but it does not stand for the proposition defendants urge -- namely, that we have recognized two separate offenses under S1956. Conley only restates the question.

### 2. The Edmonds Interpretive Principles

Since the text and the legislative history do not provide insight as to whether Congress intended in S1956(a)(1) to create separate offenses or separate means of committing a single offense, we turn for guidance to the three interpretive principles which we applied in Edmonds. The first principle (noted supra) is the general historical tradition that a jury verdict represents substantial agreement on a discrete set of actions, generally committed at a specific place at some specific time. We also noted in Edmonds that criminal statutes and the common law have also generally defined crimes both in terms of this discrete set of actions and accompanying mental states. Id. at 818-19. Of course, as Schad indicates, a statute that sets forth alternative mental states that could accompany the same set of actions does not necessarily belie this historical tradition. Thus, we conclude that this interpretive principle would not clearly bar a finding of separate means here, because, unlike Edmonds, we deal in the present case only with alternative mental states, and not with alternative courses of conduct accompanied by different mental states. In other words, on the first principle this case is more like Schad than Edmonds.

Generally speaking, we avoid statutory constructions that raise grave and doubtful constitutional questions. See Edmonds, 80 F.3d at 819. Accordingly, under the second interpretive principle, we examine whether either competing

16

construction of the statute would raise such concerns as a matter of due process. Taking our cues from Schad, we stated in Edmonds that in order to conduct this analysis, we must assess whether the alternative means are so morally disparate as to offend the considerations of historical practice and equivalent blameworthiness which underpin due process. On the historical practice axis, while we are not presented here with a criminal statute with a rich common law or statutory history, see infra, there are certainly analogous circumstances where single offenses with alternative mental states have been permitted. In fact, we need look no further than the murder statute at issue in Schad itself. Thus, a historical inquiry would not appear to militate in favor of the separate offense construction.

We similarly find little doubt cast on the separate means construction of S1956(a)(1) by an equivalent blameworthiness analysis. We would be hard-pressed to find that the level of culpability among the promotion, conceal or disguise, and reporting requirement alternatives is morally disparate in any significant sense. Indeed, the avoidance of reporting requirements strikes us as but one method of concealing large amounts of illicit proceeds, and to conceal illegal activity is to promote that activity in an important sense. As these brief comments demonstrate, the three mental states are closely related, and construing them as various means of committing the same offense would appear consistent with due process.

The third principle is the rule of lenity. As in Edmonds, the ambiguity on the face of the statute, combined with the lack of relevant legislative history, would counsel us to apply the rule of lenity and construe the statute in favor of the defendants. See Edmonds, 80 F.3d at 820-21. In Edmonds, we note, the rule of lenity was read in conjunction with findings on the other two interpretive principles supportive of the defendant's claim. It was this combination, rather than the rule of lenity standing alone, that lead us to read the CCE statute to require jury unanimity on each predicate offense. Id. at 821-22. In the present case, however, the other two principles suggest that we should accept the government's interpretation of the statute, and the mere application of the rule of lenity in

17

these circumstances is insufficient to compel a different result. Thus, our Edmonds analysis leads us to the conclusion that Congress intended the S1956(a)(1) alternatives to be construed as separate means of committing the same offense.

The foregoing discussion should not be construed as cutting back on our aspirational pronouncement in Edmonds that Congress should speak clearly (unlike here) when it wants to create alternative means of committing the same offense, and that the failure to speak clearly will counsel a finding of separate offenses. In this case, however, defendants simply cannot demonstrate that the Edmonds principles would support their reading even in the absence of an amendment to the statute providing a clear statement to the contrary.

C. Application of Schad – Due Process

Under Schad, once we have determined that the legislature intended to create different means for violating the same offense, we must assess whether that statutory definition is constitutional as a matter of due process. Although the Schad plurality did not exhaustively define the universe of those considerations potentially relevant to judgments, it did suggest that the core of the analysis is an examination of (1) history and widely shared practice as indicators of what fundamental fairness and rationality require; and (2) the equivalent blameworthiness and culpability of the alternatives. See Schad, 501 U.S. at 640–42, 645. We recognize that these are the same factors that we have applied in our legislative intent analysis under Edmonds, supra; the difference is that our analysis under the second Schad prong is generally more searching, as we must decide whether the legislature's construction actually violates due process, rather than expressing a preference for the construction which is more likely to avoid constitutional questions.

1. Historical Practice

As in Edmonds, there is no clear historical analogue to the federal money laundering statute. The Money Laundering Control Act of 1986, Pub. L. No. 99–570,

18

SS1351–52, 100 Stat. 3207, 3207–18, defines and prohibits for the first time a category of activity known as money laundering. See Max Kaufman, et al., Money Laundering, 34 Am. Crim. L. Rev. 793, 794 (1997). The legislation has its origins in three otherwise disparate doctrinal threads: (a) an evolving law of conspiracy; (b) forfeiture law; and (c) law enforcement authorities' perceived difficulties with enforcement of the currency transaction reporting requirements of the Bank Secrecy Act, 31 U.S.C.SS5311–5324 (1988). See G. Richard Strafer, Money Laundering: The Crime of the 90's, 27 Am. Crim. L. Rev. 149, 150 (1989); see also Scott Sultzer, Money Laundering: The Scope of the Problem and Attempts to Combat It, 63 Tenn. L. Rev. 143 (1995) (discussing background of money laundering legislation). As Schad noted, historical analysis will be "less useful as a yardstick in cases dealing with modern statutory offenses lacking clear common-law roots than it is in cases ... that deal with crimes that existed at common law." Schad, 501 U.S. at 640 n.7. That is precisely the case here. While the mere novelty of the statute does not insulate it from the type of critical examination which Schad mandates that we conduct to determine whether this statutory definition is fundamentally fair and rational, id. at 643, defendants have failed to persuade us that history demands construing S1956(a)(1) as creating separate offenses in order to satisfy due process.

As noted supra, we are not faced with a statute like the CCE statute at issue in Edmonds, which involved the potential interpretation of alternative predicate offenses as different means of violating a single continuing series element. Instead, we are presented with a statute which, like the murder statute at issue in Schad, sets forth alternative mental states. If we examine the law of conspiracy –– one historical keystone for S1956–– it is clear that when a jury returns a general guilty verdict on a multiple-object conspiracy count, the conviction will stand over Fifth Amendment due process objections so long as there is sufficient evidence to support any one of the objects of the conspiracy. United States v. Conley, 92 F.3d 157, 163 (3d Cir. 1996) (citing Griffin v. United States, 502 U.S. 46, 56–57 (1991)); Edmonds, 80 F.3d at 839 (Garth, J. concurring in part and dissenting in part); see also United

19

States v. Vastola, 989 F.2d 1318, 1330 (3d Cir. 1993) (discussing Griffin). In the present case, defendants were charged with conspiring to money launder, and thus the alternative mental states act essentially as surrogates for the objects of the conspiracy. In that sense, the Conley-Griffin analysis of multiple-object conspiracy counts provides an apt historical analogue for the statutory scheme at issue here, and counsels that a specific unanimity instruction should not be constitutionally required. We would be hard-pressed to find that historical analysis clearly would compel the conclusion that the separate means construction of S1956 violates due process.

## 2. Equivalent Blameworthiness

The second due process requirement, according to Schad, is that different means of committing the same offense, for which unanimity is not required, must reflect notions of equivalent blameworthiness or culpability. See Schad, 501 U.S. at 643. The proper critical question, Schad informs us, is not whether the three alternative means are moral equivalents in all possible cases; the question is whether the alternatives could ever be treated as the equivalents of each other. Id. at 643-44. As the Supreme Court stated:

> Whether or not everyone would agree that the mental state that precipitates death in the course of robbery is the moral equivalent of premeditation, it is clear that such equivalence could reasonably be found, which is enough to rule out the argument that this moral disparity bars treating them as alternative means to satisfy the mental element of a single offense.

Id. at 644-45. We are persuaded that the same conclusion obtains here. We have little doubt that the intent to promote an unlawful activity can reasonably be found to be the moral equivalent of the intent to conceal or disguise the proceeds from such an activity. Indeed, those intents will, in many cases, be coextensive. Similarly, the intent to conceal or disguise and the intent to avoid reporting requirements could reasonably be found to be morally equivalent in the majority of cases.[5] Thus, we cannot

_____

5. Defendants argue that finding moral equivalence here ignores the nature of the three alternatives, since, they contend, there is a

20

conclude that the different routes of violating the statute are so morally disparate that a legislature cannot constitutionally treat them as mere means. See Edmonds, 80 F.3d at 820. Thus, the separate means construction does not plainly violate due process.

D. Jury Confusion

Defendants further contend that their verdicts should be reversed on the ground that the jury charge, because of the lack of a specific unanimity instruction, was capable of confusing and misleading the jury, citing our opinion in Bennis v. Gable, 823 F.2d 723, 727 (3d Cir. 1987). The basis for this contention is the fact that, although the money laundering statute is written -- and the jury was instructed -- in the disjunctive, the indictment was drafted in the conjunctive and the government focused its efforts at trial on only one of the three alternative mental states. According to defendants, such circumstances take this case out of the routine case in which a general unanimity charge will ensure that the jury is unanimous on the factual basis for a conviction, even where an indictment alleges numerous factual bases for criminal liability. See United States v. Beros, 833 F.2d 455, 460 (3d Cir. 1987). We disagree.

In United States v. Cusumano, 943 F.2d 305 (3d Cir. 1991), the defendant was indicted under a statute that lists multiple routes to a conviction in the disjunctive. As in the present case, while the language of the indictment was written in the conjunctive, the district court charged the jury in the disjunctive. Cusumano challenged his conviction under this charge, arguing that the court should have charged the jury in the conjunctive, and, failing that, the

_____

substantial difference between plowing funds back into an illegal narcotics business and avoiding currency transaction reporting requirements. Even if true, under Schad, we need only find that the equivalence could ever reasonably be found. We believe that there is no significant disparity in blameworthiness between promoting illegal activity and avoiding a requirement to report financial transactions associated with that activity, since avoiding the reporting requirements often promotes the continuation of the illegal activity.

21

district court should have given a specific unanimity instruction under Beros (i.e., informing the jury that they must be unanimous in concluding that he had committed one of the disjunctive acts). We rejected both claims, noting first that "the general rule is that when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive . . . the verdict stands if the evidence is sufficient with respect to any of the acts charged." Id. at 311. We held that this rule extends to cases where the indictment is in the conjunctive, but the jury instructions were in the disjunctive. Id. Furthermore, we found that since Cusumano's case did not involve allegations of different sets of facts, the only possible jury confusion arose from the disjunctive nature of the jury charge under the statute. Cusumano, 943 F.2d at 312. We concluded that there was an insufficient risk of jury confusion under such circumstances to trigger the need for a specific unanimity instruction. Id. This case is quite analogous. In light of Cusumano, we do not believe that defendants have demonstrated plain error here.

E. Conclusion

For all the foregoing reasons, we conclude that application of the Schad-Edmonds test to the present statute yields the conclusion that it is neither clear nor obvious that the three alternative mental states defined in S1956 could not properly be treated as separate means of committing a single offense. We find especially persuasive the reasoning in Holmes that the point of the money laundering statute is to punish a financial transaction involving known illicit proceeds, accomplished for a guilty purpose. That multiple purposes could satisfy this end does not mean that Congress intended to create multiple offenses.6

_____

6. To the contrary, like the court in Holmes we find problematic the obvious import of defendants' position -- namely, that a subsequent defendant could be convicted of two different money laundering offenses based on the same transaction simply because he knew that his prohibited conduct was designed for two unlawful purposes. See Holmes, 44 F.3d at 1155. Take, for example, the situation in which a defendant deposits proceeds from an investment fraud scam into a bank account, and then purchases a cashier's check on that account which he uses to

Therefore, under a plain error standard of review, no specific unanimity instruction was necessary.

We recognize that the Paramo footnote could potentially be read to the contrary. We believe, however, that the relevant language in that footnote is unclear as to its import, and it does not control our decision in this case where we review for plain error. We have indicated why, under the Schad-Edmonds analysis, we think that defendants' interpretation of the Paramo footnote is wrong. We leave, however, to another day (or to the en banc court) the task of definitive interpretation.

Issue 3 - Did the government present insufficient evidence to convict Nunez of conspiring to launder money?

When a conviction is challenged on sufficiency of evidence grounds, we must "view the evidence in the light most favorable to the verdict, and must presume that the jury has properly carried out its functions." United States v. Coleman, 811 F.2d 804, 807 (3rd Cir. 1987) (citations omitted). A defendant seeking to overturn a verdict for

_____

pay off a mortgage on a piece of property which he owns. Further suppose that while much of the property is used for legitimate purposes, the defendant also conducts his investment scam from an office on the property. This transaction could satisfy the conceal or disguise prong of S1956(a)(1), and it could potentially also satisfy the promotion prong, since by paying off the mortgage, the defendant was able to continue to use the office and conduct his fraudulent venture. See United States v. Wilson, 77 F.3d 105 (5th Cir. 1996) (purchase of house with drug proceeds could satisfy both promotion and concealment prongs); United States v. Johnson, 971 F.2d 562 (10th Cir. 1992) (sufficient evidence to satisfy promotion prong when defendant uses illicit proceeds to pay mortgage on his home, which includes office used to conduct fraudulent venture). Similarly, if the same defendant purchased a high-priced automobile in the name of a phony corporation and used that automobile to impress potential victims and encourage them to contribute to his sham investments, both the promotion and conceal or disguise prongs could be satisfied. Id. If we accepted defendants' logic, our hypothetical defendant could be convicted of two separate crimes in each instance. But see Wilson, 77 F.3d at 108-09 & n.2 (5th Cir. 1996) (upholding conviction under S1956(a)(1)(B)(i) and S1956(a)(1)(A)(i) based on same transaction).

23

insufficient evidence "bears a heavy burden." United States v. Carr, 25 F.3d 1194, 1201 (3d Cir. 1994) (citations omitted).

To sustain a conspiracy charge, "the government can rely entirely on circumstantial evidence to prove" the conspiracy as long as the inferences drawn from the circumstantial evidence "have a logical and convincing connection to the facts established." Id. at 1201 (citations omitted). The government must prove that the conspirators had"a unity of purpose, an intent to achieve a common goal, and an agreement to work together." Id. at 1201. In order to sustain a conviction for conspiracy to launder money, Conley requires the government to establish (1) a conspiracy to launder money was entered into by two or more people; (2) one of the conspirators committed an overt act in furtherance of the conspiracy; (3) the defendant knew the purpose of the conspiracy; and (4) the defendant deliberately joined the conspiracy. Conley, 37 F.3d at 976–977.7

In this case, the government established the first element of the existence of the conspiracy through the testimony of Robert and Rosario Foti. These two leaders of the conspiracy made it clear that a conspiracy existed. They also admitted that they engaged in a number of overt acts to further the conspiracy. Nunez, as to the third element, denies that he knew the purpose of the conspiracy. The evidence against him is that he was present in an automobile when Robert Foti and another person were discussing the conspiracy. Upon his arrest, Nunez informed a U.S. Customs officer that he was aware he was receiving drug money. Nunez went with Foti to pick up over a half-million dollars in cash from a fast-food parking lot. Deliveries of this type occurred on various occasions.

_____

7. The parties have stated the elements the government must prove as being different from the Conley test, preferring to rely on Brown. However, in Brown, the defendant was contesting his conviction of money laundering, whereas Nunez contests his conviction of conspiring to launder money. Thus, Conley is the more accurate statement of the elements the government must satisfy.

24

Nunez now attempts to discredit each piece of evidence against him. Such attempts are futile; we do not weigh the evidence. Instead, we determine only if enough evidence was presented upon which a jury could convict. Nunez's admission to the U.S. Customs officer that he knew he was receiving drug money is enough to establish his knowledge of the conspiracy. Nunez's participation in picking up and counting thousands of dollars of cash from fast-food parking lots is further evidence from which a reasonable jury could conclude Nunez was aware of the purpose of the conspiracy. The government also showed that Nunez deliberately joined the conspiracy. By arranging to pick up hundreds of thousands of dollars in cash from fast-food parking lots, Nunez deliberately furthered the conspiracy, and thus joined it.

Therefore, Nunez's request for a new trial is denied.

V. Other Grounds

The defendants also argue they are entitled to a new trial because of the ineffective assistance of counsel, newly-discovered evidence, prosecutorial misconduct, and an improper willful blindness jury instruction. All of these issues were adequately addressed by the district court in its post-trial order denying the defendants' motion for a new trial. None of these contentions merits any further consideration.

We AFFIRM the rulings of the district court.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

25