

Opinions of the United
States Court of Appeals
for the Third Circuit

8-12-2002

# USA v. Brown

Precedential or Non-Precedential: Non-Precedential

Docket No. 01-2600

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"USA v. Brown" (2002). *2002 Decisions.* Paper 491.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/491

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 01-2600

———

UNITED STATES OF AMERICA

v.

JAMES BROWN, JR.,

Appellant

———

No. 01-2755

———

UNITED STATES OF AMERICA

v.

RANDOLPH S. GUSTAVE,

Appellant

———

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Crim. No. 00-136)
District Judge: Honorable Alan N. Bloch

———

Submitted under Third Circuit LAR 34.1(a)
July 19, 2001

Before: McKEE, FUENTES and ALDISERT, Circuit Judges.

_____

OPINION OF THE COURT

_____

ALDISERT, Circuit Judge.

James Brown, Jr. was convicted of: (1) one count of conspiracy to distribute and possess with intent to distribute in excess of 1,000 kilograms of marijuana, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(A)(vii); and (2) conspiracy to conduct financial transactions involving the proceeds of illegal drug trafficking, in violation of 18 U.S.C. § 1956(h). He was sentenced to 97 months for each count, to be served concurrently, in addition to five years of supervised release. He now appeals both his conviction and sentence at No. 01-2600.

His appeal requires us to decide whether the district court abused its discretion or committed an Apprendi error when it: (1) denied Brown's request to charge the jury regarding the amount of marijuana; (2) sentenced him without finding facts as to the amount for which he was responsible; (3) denied his request for a downward departure for a minor role in the conspiracy; and (4) denied his motion for acquittal contending that there was insufficient evidence to prove money laundering under Rule 29, Federal Rules of Criminal Procedure.

Randolph S. Gustave was convicted of: (1) conspiracy to distribute marijuana in violation of 21 U.S.C. § 846; (2) conspiracy to launder monetary instruments in violation

of 18 U.S.C. § 1956(h); and (3) laundering of monetary instruments in violation of 18 U.S.C. § 1956(a)(1)(A)(i). He was sentenced to a term of imprisonment of 324 months for the marijuana conspiracy count. On the money laundering counts, he was sentenced to 240 months, to be served concurrently with the conspiracy sentence. He now appeals the convictions at No. 01-2755.

Gustave contends that there was insufficient evidence to support the conspiracy convictions. He also contends that the court erred in enhancing his sentence for possessing a firearm, serving as an organizer or leader in the offense, and obstructing justice.

Because the parties involved in this case are familiar with the facts and procedural background, we will only discuss the legal issues presented. We affirm.

## I.

### A.

During Brown's trial, the jury was first instructed as to the conspiracy offense, and then was instructed as follows:

> If you find that the government has failed to prove beyond a reasonable doubt that a conspiracy to distribute and possess with intent to distribute in excess of 1,000 kilograms of marijuana did exist, then you must return a verdict of not guilty as to all the defendants as to Count 1 . . . .

> If however, you find that the government has proven beyond a reasonable doubt that a conspiracy to distribute and possess with intent to distribute in excess of 1,000 kilograms of marijuana did exist, then you must go on to consider whether the government has proven beyond a reasonable doubt the remaining two elements of the crime.

Appellee's Brief at 39-40.

3

Brown argues that this jury instruction conflicts with the teachings enunciated by the Court in Apprendi v. New Jersey, 530 U.S. 466 (2000). He further insists that the jury should have been instructed to determine the amount of marijuana specifically attributed to him. However, because he did not make this request at trial, we now review this for plain error. United States v. Russell, 134 F.3d 171, 180 (3d Cir. 1998).

The superceding indictment alleged the identity of the controlled substance--marijuana, as well as its amount--more than 1,000 kilograms. The instruction also complied with the requirements set forth in United States v. Vazquez, 271 F.3d 93, 103 (3d Cir. 2001); United States v. Barbosa, 271 F.3d 438, 459-460 (3d Cir. 2001).

To the extent he argues that the jury should have determined the amount of drugs attributable to him in the conspiracy, this contention is foreclosed by Barbosa, in which we held that the government need not prove that a defendant conspired to distribute a specific amount of drugs. Barbosa, 271 F.3d at 459. In Barbosa, we held that "a defendant who is in actual possession of a particular controlled substance, while intending to distribute another, may be punished for the drug with which he is found to be in possession." Id.

The offense for which he was convicted, violation of 21 U.S.C. §846, is inextricably intertwined with 21 U.S.C. § 841(a)(1). Section 846 states that "any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 18 U.S.C. § 846. Thus, this section makes it a crime for anyone to conspire to commit any offense described within the statutes addressing

4

controlled substances.  This includes § 841(a)(1).  Thus, there is no violation of Apprendi.

**B.**

Under the sentencing guidelines, Brown's base level was 32, indicating that he was responsible for more than 1,000 kilograms but less than 3,000 kilograms of marijuana.  He did not contest the offense level of 32.  He now contends that the sentencing court committed plain error because it "failed to make a specific finding of the amount [of marijuana] that Brown knew or should have known or foreseen was involved in the conspiracy."  Appellant's Brief at 32.  However, he made no objection to the amount attributed to him.

The court was permitted to accept the pre-sentence report as a factual finding.  According to this report, Brown's base offense level was 32, indicating that he was responsible for more than 1,000 but less than 3,000 kilograms of marijuana.  He did not challenge the finding of an offense level of 32 in his written objections to the report.

These contentions are reviewed under the plain error standard.  United States v. Nappi, 243 F.3d 758, 761 (3d Cir. 2001).

Because Brown did not object to the drug quantity attributable to him, the district court was permitted to accept the pre-sentence report as its factual findings.  See Rule 32(b)(6), Federal Rules of Criminal Procedure; United States v. Gricco, 277 F.3d 339, 355 (3d Cir. 2002).  This precedent applies to matters of drug quantity.  United States v. Ruiz, 43 F.3d 985, 989 (5th Cir. 1995).

Brown's base offense level was correctly assessed.  A number of witnesses,

5

including Brown's children, testified as to the extent of Brown's involvement in the drug conspiracy. Michael Johnson testified that he delivered hundreds of pounds of marijuana to Robert Evans and Brown in 1994. Several of these shipments were delivered to Brown's residence. Brown also repackaged these shipments into smaller quantities.

Between 1995 and 1999, Jones was receiving two shipments of marijuana per month ranging in size from 100 to 150 pounds. Brown helped unload and repackage these shipments at three separate locations: the garage of Verl Heard, Sr., the volunteer firehouse, and the safe house in Elizabeth, Pennsylvania. Jones also advanced Brown marijuana in amounts ranging from one to two pounds. App. at 693-700. Priscilla Wilson testified that Brown and Jones hid a couple hundred pounds of marijuana at her house. Heard also stated that Brown came to Gustave's house in December 1999 after Ramos and Leal had delivered 300 pounds of marijuana. On this occasion, Brown took two bags of marijuana from the shipment.

The government's evidence established that Brown was either involved with or directly handled hundreds, if not thousands, of pounds of marijuana.[1] In addition to the amount of marijuana for which Brown is directly responsible, all of the marijuana involved in the conspiracy is attributable to him. His stepson was a drug dealer, a fact well known to

_____

[1] The total minimum amount of marijuana involved in the conspiracy was 6,186 pounds or 2811 kilograms. This figure is based upon the testimony provided by Jones and couriers concerning the number and size of the shipments that reached Pittsburgh. During the course of the conspiracy, various law enforcement agencies seized 1,200 pounds. Based upon the testimony of Heard, Leal and Ramos, Duran successfully shipped 2,300 pounds to Gustave in 1999-2000.

6

Brown. Brown was aware that Jones was receiving large amounts of marijuana during the conspiracy's existence. Brown also knew that numerous people were involved in the conspiracy. Brown's involvement with the conspiracy continued until 2000, when Jones had been replaced by Gustave.

Brown's connection to the conspiracy was neither sporadic nor intermittent. As the district court noted, Brown's involvement with the conspiracy and its members was constant. Given this, the court was not able to conclude that he was unaware of the nature and scope of the criminal enterprise. Under these circumstances, the court's determination that Brown's base offense was a level 32 was neither clearly erroneous nor plainly erroneous.

## C.

Brown contended he was a minor participant and entitled to a two-level adjustment. We do not agree.

A minor participant is one who is "less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3(b)1.2, cmt. n.5 (2001). Minor participant status depends on whether the defendant's involvement, knowledge and culpability were materially less than other participants. Brown bore the burden of proving by a preponderance of the evidence that he was a minor participant. Such a determination necessarily depends "on such factors as the nature of the defendant's relationship to other participants, the importance of the defendant's action to the success of the venture, and the defendant's awareness of the nature and scope of the criminal enterprise." United States v.

7

<u>Price</u>, 13 F.3d 711, 735 (3d Cir. 1994).

In this case, Brown rented automobiles for Jones and Gustave, which were subsequently utilized in drug-related activity.  Additionally, he obtained cell phones for Gustave and Jones which were also used to further the goals of the conspiracy.  In view of the discussion set forth in Part B, we are persuaded that he was not a minor participant, and that the court did not err in its determination.

### D.

At the end of the prosecution's case, Brown moved for a directed verdict on the charge of conspiracy to launder monetary instruments.  However, he did not renew the motion at the close of testimony.  "Accordingly, the alleged insufficiency of the evidence with respect to the essential elements of the offense must constitute plain error in order to warrant reversal."  <u>United States v. Anderson</u>, 108 F.3d 478, 480 (3d Cir. 1997).

"In order to sustain a conviction for conspiracy to launder money, [this court's precedent] requires the government to establish (1) a conspiracy to launder money was entered into by two or more people; (2) one of the conspirators committed an overt act in furtherance of the conspiracy; (3) the defendant knew the purpose of the conspiracy; and (4) the defendant deliberately joined the conspiracy.  <u>United States v. Navarro</u>, 145 F.3d 580, 593 (3d. Cir. 1993).  The doctrine of co-conspirator liability also applies to this situation.  <u>Pinkerton v. United States</u>, 328 U.S. 640 (1946); <u>see also</u> <u>United States v. Lopez</u>, 271 F.3d 472, 480 (3d Cir. 2001).

In this case, the jury was given a <u>Pinkerton</u> instruction concerning both the marijuana

8

conspiracy and the money laundering conspiracy. The defendant did not object. The government also introduced substantial evidence that Brown's co-conspirators engaged in numerous substantive acts of money laundering. Brown's step-son, Jerome Jones, testified that he frequently wired money to his drug supplier, that the money wired was considered money for drugs, and that he also enlisted the aid of his brother Lamont, as well as Gustave, Carla Magwood, Priscilla Watson, and Andrea Trowery (Brown's daughter). A total of 193 money wires were sent during the course of the money laundering conspiracy.

Brown knew that the police had additionally discovered and seized $98,000.00 from the first car he had rented. Regardless, he continued to receive marijuana long after these events. We are thus satisfied that Brown has not met his burden of proving plain error. We now turn to Gustave's appeal.

## II.

We are satisfied that there is sufficient evidence to demonstrate that Gustave was a member of both conspiracies.

## A.

In addition to repeatedly obtaining drugs from the conspiracy and its members, Gustave performed a number of drug-related acts for the conspiracy members. This court has previously held that "even an occasional supplier (and by implication an occasional buyer for redistribution) can be shown to be a member of the conspiracy by evidence, direct or inferential, of knowledge that she or he was part of a larger operation." United States v. Gibbs, 190 F.3d 188, 199 (3d. Cir. 1994) (citing United States v. Price, 13 F.3d

9

711, 728 (3d. Cir. 1994)). Jones testified that he supplied marijuana to Gustave, Heard, Antwon Rose, Colin Foster, and Brown. Additionally, he testified that he usually received twenty-five to thirty pounds of drugs on each occasion.

The relationship between Gustave and Jones went well beyond simply that of a buyer-seller. In February 1996, Anita Murphy testified that Jones asked her to rent a car. After Murphy informed Jones that she could not do so because she did not have a credit card, he told her not to worry about it as Gustave worked at the car rental company and would take care of the paperwork. As promised, Gustave took care of Murphy's paperwork.

In the presence of Jones and Michael Johnson, Murphy rented a car from Gustave. It was this car that was later stopped by a police officer in Texas and found to contain 114.38 pounds of marijuana. One of Johnson's couriers, Timothy Wynne, was driving the car. When Jones and Johnson were arrested in October 1996 on drug charges, Gustave gave Murphy the money to post Jones' bond. This took place during the same time period that Jones was supplying Gustave with marijuana.

Priscilla Wilson testified that she transported drug proceeds on Jones' behalf to Siquieros in July 1997. After arriving at the Pittsburgh airport, Wilson was questioned by federal agents. After she was released, Wilson saw [Jerome and Gustave] at the airport. Fearful that she was still being followed, Wilson gestured for them not to approach her. During the ride home, Wilson told Gustave and Jones about her encounter with the agents and that she wanted the boxes with the marijuana removed from her house. Jones and

10

Gustave's father removed the boxes later that evening.

Rhonda Hunter, another courier, testified that Gustave helped Jones smuggle cash through security at the Pittsburgh Airport and that Hunter, in turn, took this money to Siquieros. In December 1999, Gustave also recruited Hunter and Lori Spinner to drive a shipment of marijuana from New Mexico to Pittsburgh.

Gustave, not Jones, supplied the funds necessary to purchase the marijuana from Michael Johnson and Angelo Duran in December 1999. This deal was the first instance in which Duran supplied the drugs. Jerome Jones testified that Gustave "cut Michael Johnson out. They cut me out also, and that was it." App. at 652. Hence, Gustave performed numerous drug-related acts for the conspiracy members.

## B.

There was sufficient evidence to show that Gustave was a member of the money laundering conspiracy as well. Jones sent, or had sent, a total of 193 money wires. The total amount of money wired was $224,000.00. Gustave sent ten wires at Jones' behest totaling $16,387.75, and wired money to Robert Evans and Elaine Siquieros, both of whom were also members of the conspiracy. These transfers occurred at the same time that Jones was supplying Gustave with marijuana.

## C.

Before Leal left for Pittsburgh, Duran gave him two guns to protect the shipment: a machine gun and a Glock 9 millimeter handgun. On New Years Eve in 1999, Leal and Ramos went outside Gustave's house and fired the machine gun, a tradition in New Mexico.

Afterwards, Gustave, who had been away, returned home and was shown the machine gun. He, too, fired the weapon. Gustave then produced and showed Ramos and Leal a handgun. In August 2000, agents recovered a Smith and Wesson handgun from Gustave's house.

The U.S.S.G. § 2D1.1(b)(1) enhancement applies where the "weapon was present, unless it is clearly improbable that the weapon was connected with the offense." United States v. Goggins, 99 F.3d 116, 117-118 (3d Cir. 1996). The provision favors application of the enhancement irrespective of whether the weapon was actively brandished, employed, or even discharged. United States v. Demes, 941 F.2d 220, 223 (3d Cir. 1991). The sentencing court determined that "the government [had] proven that the connection between the defendant's drug crime and the weapon [was] not clearly improbable" and thus applied the enhancement. App. at 1552-1553.

As he did before the sentencing court, Gustave contends now that the nexus between the gun and the offense is nonexistent because "[t]he drug delivery had already been accomplished." Appellant's Brief at 11. Further, "[t]he gun was not brandished or used in a threatening way. It was simply fired outside into the air to celebrate the New Year, as others were also doing." Id. Nonetheless, we are not persuaded.

Although delivery of the marijuana may have been completed when Gustave showed his weapon to Leal and Ramos, the drug offense was nowhere near completion. Gustave's house was a veritable hive of drug-related criminal activity following the delivery of the drugs. Leal and Ramos had delivered 300 pounds of marijuana there. The shipment was then broken down into smaller quantities. These smaller quantities, in turn, were stored in

12

the basement. Numerous people came to Gustave's house either to retrieve more marijuana, or to bring money to Gustave. Leal and Ramos did not leave for New Mexico until Gustave had accumulated $200,000.00 to pay Duran.

## D.

The court found that Gustave was the leader of criminal activity and that the criminal activity involved five or more participants. Such a finding is essentially an enhancement that increases the base level five points. Gustave challenges this and contends that he was simply a customer of the conspiracy. We are satisfied that the record shows that Gustave was the leader and organizer of a conspiracy involving five or more participants. Rhonda Hunter and Lori Spinner both testified that Gustave recruited them to transport a shipment of marijuana from New Mexico to Pittsburgh. Jones testified that Gustave asked him to post bond for Ramos and Leal, who had been arrested in Missouri with a 400-pound shipment headed to Gustave. Ramos and Leal delivered the marijuana to Gustave and transported the money back to Gustave's drug source in New Mexico. He then bailed both men out of jail. Heard assisted Gustave in transporting drug proceeds back to Angelo Duran.

Gustave actually started out as a small dealer. However, when Johnson--the previous leader of the conspiracy--was jailed for a separate offense in New York, Gustave decided that instead of buying the marijuana from Johnson, he would simply take over Johnson's place in the drug enterprise. He then made arrangements with Angelo Duran in New Mexico to purchase directly from him.

13

Leslie Bigelow, the woman who rented an apartment on Gustave's behalf, played a role in this. After Bigelow rented the apartment, Gustave accepted a shipment of 1,000 pounds of marijuana at her apartment. He enlisted the aid of a mechanic named Joe to conceal currency in various automobiles which were later driven back to New Mexico. The cash was then delivered to Duran.

Gustave thus directly organized the activities of at least nine criminal participants and was the intended recipient of approximately 2,700 pounds of marijuana. Of this, 300 pounds were delivered to Gustave's house in late December, 1999. The marijuana was unpacked, and numerous dealers came to his house to obtain it. After the Missouri State Highway Police seized a 400-pound shipment from Ramos and Leal, Gustave posted the bond money and made the arrangements to transport the drug proceeds back to Duran.

We thus conclude that the district court's finding that Gustave was an organizer or leader is not clearly erroneous.

## E.

Gustave testified in his own behalf at trial. The sentencing court, in its tentative findings, stated:

> At trial, defendant took the stand in his defense. Throughout his testimony, defendant denied being involved in the conspiracy, contending instead that he had merely purchased marijuana from members of the conspiracy which he resold to others. However, numerous government witnesses testified as to defendant's prolonged involvement in the drug conspiracy, beginning in early 1996. Defendant denied initiating shipments of marijuana, being the intended recipient of drug shipments from co-defendant Angelo Duran and providing bond money for arrested couriers, even though numerous witnesses testified to the contrary. Defendant's testimony was willfully false and pertained to a

14

material matter, that is, participation and role in the charged drug conspiracy.
. .

By denying any involvement in drug trafficking beyond that of a mere buyer-seller relationship, defendant attempted to influence the jury's determination that he was a member of the charged conspiracy . . . .

By returning a verdict of guilt as to Count 1 . . . the jury clearly rejected defendant's testimony that he was merely a buyer from and/or seller of marijuana to conspiracy members. Moreover, this Court, having heard the evidence presented, including the testimony of defendant, has no doubt that defendant willfully gave false, material testimony concerning his involvement in the drug trafficking at issue in an attempt to avoid conviction. The false testimony was not the result of confusion, mistake or faulty memory. Accordingly, the Court finds by clear and convincing evidence that the defendant did commit perjury at the trial and that a 2 level enhancement for obstruction of justice is appropriate.

App at 1566-1568.

We are satisfied that the court did not err in enhancing the sentence for obstruction of justice.

\* \* \* \* \*

We have considered all contentions raised by the parties in both appeals and conclude that no further discussion is necessary.

The judgments of the district court in the two appeals will be affirmed.

———————

TO THE CLERK:

Please file the foregoing opinion.

/s/ Ruggero J. Aldisert
Circuit Judge
