**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Tony LIPSCOMB, Defendant–Appellant.**

No. 92–3368.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 9, 1993.

Decided Jan. 28, 1994.

---

Barry R. Elden, Asst. U.S. Atty., Crim. Receiving, Appellate Div., Gregory T. Mitchell (argued), Office of the U.S. Atty., Chicago, IL, for plaintiff-appellee.

Joshua Sachs (argued), Chicago, IL, for defendant-appellant.

Before FLAUM and MANION, Circuit Judges, and REYNOLDS, District Judge.*

REYNOLDS, District Judge.

Tony Lipscomb ("Lipscomb") appeals his conviction and sentence on charges related to drug-trafficking and weapons possession. In part, this appeal requires that we consider the proper application of Rule 704(b) of the Federal Rules of Evidence to the expert testimony of law enforcement officials. For reasons set forth below, we affirm.

## I. Proceedings Below

### A. Evidence Presented at Trial

In the early morning of September 10, 1991, a car in which Lipscomb was a passenger was chased and eventually stopped by

---

\* Hon. John W. Reynolds of the Eastern District of Wisconsin, sitting by designation.

Chicago police officers, who knew the car to be stolen. When the car stopped, both Lipscomb and its driver, John Glasper ("Glasper"), tried to escape on foot, but both were quickly caught. The officer who caught Lipscomb testified that he found, in patting him down, a .38 caliber revolver, six .38 caliber bullets, $352 in cash, including $52 in singles, and a metal case containing 34 plastic bags of cocaine weighing a total of 4.2 grams. (I Tr. at 27–29.)

Both Lipscomb and Glasper testified, however, that Lipscomb was carrying only the cash, and that the officers expressly decided to "put" the other items on him after finding them elsewhere. (II Tr. at 160–70, 178–79, 222, 229–230.) Lipscomb further testified that most of the cash represented his share of a class action settlement, and that he had no intention to distribute cocaine. (II Tr. at 208, 231.)

Three of the officers who testified as to the circumstances surrounding Lipscomb's arrest also testified as law enforcement experts. In that capacity, the officers were permitted to give their opinions of whether, based on their considerable experience in cocaine-related arrests, the cocaine said to have been found on Lipscomb was "for" street-level distribution, as opposed to personal consumption. Officer Lester Jones testified as follows:

Q. Officer, do you have an opinion as to whether this type of 34 individually packaged bags of cocaine were for street level distribution?

   \*    \*    \*    \*    \*    \*

A. Yes.

Q. What is your opinion?

A. For sale on the street.

Q. What do you base that opinion on?

A. Because of the manner in which they are packaged.

(Tr. at 33.)

Similarly, Officer Brian Murphy testified as follows:

Q. Officer, do you have an opinion based on your experience as to whether these 34 individually wrapped dime bags were for street distribution?

   \*    \*    \*    \*    \*    \*

A. I would say definitely, yes.

Q. What's the basis of your opinion?

A. The way they are packaged in the little separate things for sale, he had a weapon on him mostly either for intimidation or for his own protection, the amount of money he had, the denominations of the money with the 52 singles.

   \*    \*    \*    \*    \*    \*

Q. So part of your determination that this was street distribution was based on the 52 singles?

A. Yes, such large—large number of such small bills, that's how they usually sell them out there.

(Tr. 68–69.)

Finally, Officer Patricia Thibault testified as follows:

Q. Do you have an opinion based on your experience as to whether this cocaine that was received—that was recovered from the defendant was for street level distribution?

   \*    \*    \*    \*    \*    \*

A. In my opinion that is for street level distribution.

Q. What's the basis of your opinion?

A. The defendant had no pipes, no screens, no grain alcohol, anything that would be used in its consumption on his person.

Q. Is there any other basis for your opinion with respect to the packaging?

A. The currency and the weapon, the money and the weapon.

(Tr. at 92.) Lipscomb's objection to this testimony was overruled.

## B. Verdict and Sentencing

The jury found Lipscomb guilty on one count of possession of a firearm by a person previously convicted of a felony (count one), in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1), one count of using and carrying a firearm in relation to the commission of a drug-trafficking crime (count two), in violation of 18 U.S.C. § 924(c)(1), and one count of possession of cocaine with intent to distrib-

ute (count three), in violation of 21 U.S.C. § 841(a)(1).

Because Lipscomb had three previous convictions for violent felonies, his conviction for possession of a firearm required that he be given an enhanced sentence under 18 U.S.C. § 924(e)(1), which in turn required that he be deemed an "armed career criminal" for sentencing purposes. Sentencing Guideline § 4B1.4(a). That status, combined with the fact that Lipscomb used the firearm in connection with a "controlled substance offense," required that he be assigned an offense level of 34, as well as a Category VI criminal history, resulting in a guideline range of 262 to 327 months. Sentencing Guidelines § 4B1.4(b)(3)(A), (c)(2). In addition, as a result of his conviction for carrying a firearm in connection with a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1), Lipscomb was subject to a mandatory *consecutive* sentence of five years.

Lipscomb objected that the consecutive sentence should not be imposed because the factor on which it was based, gun possession, already had been taken into account in his sentencing, for it had put him in the category of an armed career offender. The district court, rejecting Lipscomb's argument, sentenced him to 295 months imprisonment on count one, 240 months imprisonment on count three running concurrently with the sentence on count one, and 60 months imprisonment on count two running consecutively to the sentence on count one, resulting in a total imprisonment period of 355 months.

## II. Analysis

Lipscomb contends that the district court erred in permitting the officers to give their expert opinions on whether the cocaine they found on him was for distribution rather than for his personal use. Such opinions, Lipscomb contends, go to the "ultimate issue" of whether he intended to distribute the cocaine, an element of the charge against him, and therefore should have been excluded under Rule 704(b), which provides:

> No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

Fed.R.Evid. 704(b). As discussed further below, this rule is written as an exception to Rule 704(a), which provides:

> Except as provided in subdivision (b), testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

Fed.R.Evid. 704(a).

Decisions applying Rule 704(b) to the expert testimony of law enforcement officials have found it significant whether the expert actually referred to the intent of the defendant or, instead, simply described in general terms the common practices of those who clearly do possess the requisite intent, leaving unstated the inference that the defendant, having been caught engaging in more or less the same practices, also possessed the requisite intent. Thus, in *United States v. Foster*, 939 F.2d 445, 454 (7th Cir.1991), the court held that Rule 704(b) did not preclude a detective from testifying "that, as a general rule, drug couriers" use cash, aliases, beepers, one-way tickets, "masking agents such as talcum powder," and hard-sided suitcases, all of which the defendant had used as well. Rule 704(b) did not bar such testimony, the court held, because although the testimony would support the inference that the defendant knew of the cocaine in his suitcase, the record contained no "specific statement in which [the expert] opines that [the defendant] had the requisite mental state." *Id.* Similarly, in *United States v. Wilson*, 964 F.2d 807, 810 (8th Cir.1992), Rule 704(b) was held not to bar a drug agent's expert testimony that 130 grams of methamphetamine, the amount found on the defendant, was not a typical "user quantity." The court stressed that "nowhere in the record is there a specific statement in which [the agent] says that [the defendant] had the intent to distribute the methamphetamine." *Id.*

In a recent case before this court, however, even a fairly direct reference to the defendant's intent was held not to violate Rule 704(b). *United States v. Brown*, 7 F.3d 648, 653 (7th Cir.1993). The expert in *Brown*, who, unlike the experts here, was not an arresting officer, testified that the quantity of crack cocaine found on the defendant, together with his possession of a weapon but not of any "smoking device," indicated that the cocaine "was intended for distribution." *Id.* at 650. The *Brown* court noted: "[I]f [the expert] had responded that the circumstances suggested that this cocaine probably would be distributed, there would be no Rule 704(b) issue. It is only the expert's use of the word 'intended' that implicates the rule." *Id.* at 653 n. 2. Even so, the court held that the rule had not been violated, because it was clear that the expert was merely identifying an inference that might be drawn from the circumstances surrounding the defendant's arrest, and was not purporting to express an opinion as to the defendant's "actual mental state." *Id.* at 653.

Other courts also have been willing to excuse an expert's direct reference to the defendant's intent. In *United States v. Mitchell*, 996 F.2d 419 (D.C.Cir.1993), a case quite close to this one, the court held that it was not plain error under Rule 704(b) to admit the following expert testimony:

Q: Now what, if anything, does the packaging of that crack cocaine into nine individual ziplocks tell you about the intent of the person that was carrying those ziplocks?

A: It was intent to distribute.

\* \* \* \* \* \*

Q: Why are you able to say that the person in possession of those nine individual ziplocks, $50 rocks of crack cocaine, has the intent to distribute them?

A: As I stated earlier, the packaging is consistent with the way crack cocaine is packaged for street-level distribution.

996 F.2d at 422. Essentially the same testimony (by the same expert) was held admissible in *United States v. Williams*, 980 F.2d 1463, 1465–66 (D.C.Cir.1992), because there the district court had interrupted the testimony to clarify that the expert had "no [personal] knowledge ... about this particular case." That comment, the circuit court concluded, "eliminated the difficulty by leading the jury to understand that [the expert's] assessment of the 'intentions of the person who possessed those bags' addressed the intentions of a hypothetical typical individual, not [the defendant] in particular." 980 F.2d at 1466.[1]

In view of *Brown* and these other decisions, it is hard to say that Rule 704(b) imposes any real limitation on the kind of expert law enforcement testimony at issue here. The officers in this case did not say "intent" or "intended," the magic words triggering application of the rule. And even if they had said them, still we could not find a violation of Rule 704(b), because the officers, like the expert in *Brown*, expressly based their opinions on analysis of what might be called the external circumstances of Lipscomb's arrest, rather than on any purported knowledge of his "actual mental state."

But this is hardly a satisfying resolution of the problem. In the first place, though officers did not in fact say "intent" or "intended," they might as well have, for the effect would have been exactly the same. If the drugs found on Lipscomb "were for street-level distribution," as each of the officers testified, then Lipscomb possessed them for that purpose; he intended to distribute them. Further, it would seem to make little difference that the officers' opinions were based on an analysis of the external circumstances of the arrest, for the officers still would have "state[d] an opinion or inference as to wheth-

---

1. *See also: United States v. Windfelder*, 790 F.2d 576, 582 (7th Cir.1986) (in prosecution for filing false tax return, error under Rule 704(b) to admit statement by IRS agent that the defendant "intentionally understated his income," but error was harmless); *United States v. Dotson*, 817 F.2d 1127, 1132, *vacated in part on other grounds*, 821 F.2d 1034 (5th Cir.1987) (in prosecution for tax evasion, "no error" under Rule 704(b) to admit statement by IRS agent that defendant "wilfully and intentionally increased his income knowing full well that he had not reported the taxes due thereon").

er the defendant did or did not have the mental state or condition constituting an element of the crime charged," and this is what the rule forbids.

All this assumes, however, that Rule 704(b) does in fact apply to the officers' testimony, an assumption worth questioning in view of the courts' apparent reluctance to rigorously enforce the rule in similar cases. Indeed, there is reason to think that the rule states only a very limited exception to general rule, set forth in Rule 704(a), that witnesses *may* give opinions on ultimate issues. The 1984 Senate Report introducing Rule 704(b) explains its purpose as follows:

> With respect to limitations on the scope of expert testimony *by psychiatrists and other mental health experts*, section 406 of title IV of the bill amends Rule 704 of the Federal Rules of Evidence to [add section (b).]
>
> . . . .
>
> The purpose of this amendment is to eliminate the confusing spectacle of competing expert witnesses testifying to directly contradictory conclusions as to the ultimate legal issue to be found by the trier of fact. Under this proposal, *expert psychiatric testimony* would be limited to presenting and explaining their diagnoses, such as whether the defendant had a severe mental disease or defect and what the characteristics of such a disease or defect, if any, may have been. The basis for this limitation on expert testimony in insanity cases is ably state by the American Psychiatric Association:
>
> . . . .
>
> > When . . . "ultimate issue" questions are formulated by the law and put to the expert witness who must then say "yea" or "nay," then the expert witness is required to make a leap in logic. He no longer addresses himself to medical concepts but instead must infer or intuit what is in fact unspeakable, namely, the probable relationship between *medical concepts* and legal or moral constructs such as free will. . . .
> >
> > . . . .
> >
> > Moreover, the rationale for precluding *ultimate opinion psychiatric testimony*

extends beyond the insanity defense to any ultimate mental state of the defendant that is relevant to the legal conclusion sought to be proven. The Committee has fashioned its Rule 704 provision to reach all such "ultimate" issues, e.g., premeditation in a homicide case, or lack of predisposition in entrapment.

S.Rep. No. 225, 98th Cong., 2d Sess. 230–31 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3412–13 (emphasis added).

■ Similarly, the report of the House Judiciary Committee states:

> While the medical and psychological knowledge of expert witnesses may well provide data that will assist the jury in determining the existence of the [insanity] defense, no person can be said to have expertise regarding the legal and moral decision involved. Thus, with regard to the ultimate issue, *the psychiatrist, psychologist or other similar expert* is no more qualified than a lay person.

H.R.Rep. No. 577, 98th Cong., 1st Sess. 16 (1983) (emphasis added). Thus, it is evident that Rule 704(b) was designed to avoid the confusion and illogic of translating the "medical concepts" relied upon by "psychiatrists and other mental health experts" into legal conclusions.

That limited purpose, furthermore, is reflected in the language of the rule. The rule does not purport to apply to every expert witness; instead, its first phrase restricts its application to experts "testifying with respect to the mental state or condition" of a criminal defendant. If this first phrase is to mean anything at all, then presumably it cannot mean the same thing as the second, because that phrase ("an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto") only describes the kind of opinion that witnesses described in the first phrase are forbidden from offering. Put differently, if every expert who offers the type of opinion described in the second phrase thereby becomes the type of expert described in the first, then the first phrase is rendered superfluous. To avoid that result, the first phrase

must be read more narrowly than the second. And so the most sensible way to read it, in light of its terms and the purpose of the rule, is as referring to testimony based on a "psychiatric" or similar "medical" analysis of the defendant's mental processes. *See United States v. Richard*, 969 F.2d 849, 855 n. 6 (10th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 248, 121 L.Ed.2d 181 (1992) (suggesting, without deciding, that Rule 704(b), should be confined to such testimony).

The expert law enforcement testimony at issue in this case did not, of course, depend on any such analysis. Nor did the testimony present the kind of danger Rule 704(b) was designed to avoid. The Senate and House reports quoted above indicate that the danger associated with mental health testimony is that the expert, who is qualified only to explain medical concepts, will be called upon to interpret legal ones. No similar danger arises from the testimony of law enforcement experts because, by definition, they are qualified to identify illegal behavior and to distinguish among its various forms. It is no stretch, then, for a law enforcement expert to say that a certain pattern of conduct evinces a particular kind of criminal activity. On the contrary, such testimony is considered quite helpful in drug-trafficking cases. *See Brown*, 7 F.3d at 652; *Foster*, 939 F.2d at 451–52.

Still, this "modus operandi" testimony is understood to carry dangers of its own, particularly when the expert is also one of the officers involved in the arrest. The central danger seems to be that the jury may attach "undue weight" to the officer's testimony, either by mistaking an expert opinion for what is really only an eyewitness observation, or by inferring that the officer's "opinion about the criminal nature of the defendant's activity is based on knowledge of the defendant beyond the evidence at trial." *United States v. Alvarez*, 837 F.2d 1024, 1030 (11th Cir.), *cert. denied*, 486 U.S. 1026, 108 S.Ct. 2003, 100 L.Ed.2d 234 (1988); *Foster*, 939 F.2d at 452; *United States v. DeSoto*, 885 F.2d 354, 360 (7th Cir.1989); *United*

*States v. Young*, 745 F.2d 733, 765–66 (2d Cir.1984) (Newman, J., concurring), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985) (cited in *United States v. Brown*, 776 F.2d 397, 401 n. 6 (2nd Cir.), *cert. denied*, 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986)).

These concerns may be addressed, of course, without reference to Rule 704(b). Under Federal Rule of Evidence 702, the district court is required to ensure that the testimony of a law enforcement expert, like that of any other, is "confine[d] ... to comments that would be helpful to the jury." *Foster*, 939 F.2d at 452.[2] Further, if the probative value of the expert's testimony is found to be "substantially outweighed by the danger of unfair prejudice," the testimony, or some portion of it, must be excluded under Federal Rule of Evidence 403. Generally, the danger of unfair prejudice that results from an officer performing the dual role of eyewitness and expert can be minimized by cautionary instructions and by carefully constructed examination. *Foster*, 939 F.2d at 453.

■ Notwithstanding these alternatives, we simply cannot ignore the fact that this court and others have routinely assumed that Rule 704(b) imposes an additional limitation, however slight, on the expert testimony of law enforcement officials. To reconcile that fact with our impression, discussed above, that the rule is of more limited scope, we conclude that when a law enforcement official states an opinion about the criminal nature of a defendant's activities, such testimony should not be excluded under Rule 704(b) as long as it is made clear, either by the court expressly or in the nature of the examination, that the opinion is based on the expert's knowledge of common criminal practices, and not on some special knowledge of the defendant's mental processes. Relevant in this regard, though not determinative, is the degree to which the expert refers specifically to the "intent" of the defendant, *see Brown*, 7

2. Rule 702 provides:
    If scientific, technical, or other specialized knowledge will *assist the trier of fact to understand the evidence or to determine a fact in issue,* a witness qualified as an expert by

knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
Fed.R.Evid. 702 (emphasis added).

F.3d at 653 n. 2, for this may indeed suggest, improperly, that the opinion is based on some special knowledge of the defendant's mental processes.[3]

■ In this case, each of the challenged opinions was immediately followed by a precise explanation of the grounds for the opinion, and the grounds cited made it clear that the officers were relying on their knowledge of common practices in the drug trade, rather than on some special familiarity with the workings of Lipscomb's mind. In addition, the point at which the officers ceased speaking as eyewitnesses to the arrest and began speaking as experts on law enforcement was well defined during direct examination, thus lessening the danger that the jury would confuse one form of testimony for the other. We conclude, therefore, that the district court was correct to overrule Lipscomb's objection to admission of the officers' expert opinions.

■ On a related matter, Lipscomb argues that the government did not prove beyond a reasonable doubt his intent to distribute, because such intent cannot be inferred from the relatively small quantity of cocaine (4.2 grams) allegedly found in his possession. We conclude, however, that the packaging of the cocaine in 34 separate baggies, together with Lipscomb's contemporaneous possession of a gun, ammunition, and a large amount of cash, was sufficient evidence, taken in the light most favorable to the government, to support the verdict.

■ Finally, Lipscomb contends that the five-year sentence required under 18 U.S.C. § 924(c)(1) for carrying a firearm in the commission of a drug-trafficking offense should not have been imposed as a consecutive sentence, because his possession of the firearm was already taken into account in determining his sentence on the drug-trafficking charge. Lipscomb's position is foreclosed, however, by the language of Section 924(c)(1), which provides that the five-year sentence shall *not* "run concurrently with any other term of imprisonment including that

imposed for the ... drug trafficking crime in which the firearm was used or carried." 18 U.S.C. § 924(c)(1). Because the statute expressly requires "cumulative punishments" in cases such as this, imposition of the consecutive five-year sentence did not violate the double jeopardy clause of the Fifth Amendment. *United States v. Garrett,* 903 F.2d 1105, 1114 (7th Cir.), *cert. denied,* 498 U.S. 905, 111 S.Ct. 272, 112 L.Ed.2d 227 (1990).

For the foregoing reasons, Lipscomb's conviction and sentence are

AFFIRMED.

---

3. If the expert testimony is not precluded by Rule 704(b), it still must satisfy the standards of Rules 403 and 702.