**UNITED STATES of America**

v.

**Tyrone MARTIN.**

**No. CRIM. A. 00–710.**

United States District Court, E.D. Pennsylvania.

Feb. 6, 2002.

---

Joseph G. Poluka, U.S. Attorney's Office, Philadelphia, PA, for U.S.

Joseph D. Mancano, Britt, Hankins, Schaible & Moughan, Tariq Karim El-Shabazz, Philadelphia, PA, for defendant.

## MEMORANDUM

EDUARDO C. ROBRENO, District Judge.

A jury convicted defendant Tyrone Martin of one count of possession with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1) and one count of carrying a firearm in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1). Presently before this court is the defendant's Motion for Post–Trial Relief (doc. no. 76) in which defendant asserts two arguments as to why he is entitled to a new trial pursuant to Federal Rule of Criminal Procedure 33.

First, the defendant asserts that the court erroneously refused to suppress evidence discovered in Martin's vehicle because the investigatory stop and subsequent search and seizure violated defendant's Fourth Amendment rights. Second, that under the recent decision of *United States v. Watson*, 260 F.3d 301 (3d Cir.2001), Detective Matthew Mc-Donald's testimony as to defendant's state of mind improperly violated Federal Rule of Evidence 704(b).

The court finds that the evidence found in defendant's vehicle was properly admitted into evidence. Moreover, the introduction of testimony of Detective McDonald was not error, and, even if the admission of the testimony was error, it was not plain error. Thus, the defendant's request for a new trial will be denied.

### A. *Suppression of the Evidence*

Defendant makes two arguments as to why evidence was seized from his vehicle in violation of his Fourth Amendment rights. First, defendant argues that the court erred in denying his motion to suppress the evidence based on a lack of reasonable suspicion to justify the initial stop of the defendant. Second, defendant asserts that even if the investigatory stop was proper, the officers did not have probable cause to search his vehicle.[1]

### 1) *Reasonable Suspicion for Initial Stop of Defendant*

In its June 12, 2001 Order and Memorandum, the court denied defendant's motion to suppress. *See United States v. Tyrone Martin*, 155 F.Supp.2d 381 (E.D.Pa.2001). The facts surrounding the police officers' stop and search of defen-

---

**1.** This argument was not asserted at the suppression hearing held prior to trial.

dant's vehicle are detailed at length in the court's earlier opinion and only a brief recitation will be included here.

On the night of February 6, 1999, between the hours of 3:30 p.m. to 11:30 p.m., Officers Whitaker and Fletcher were patrolling a section of Northwest Philadelphia in an unmarked car and wearing plainclothes. The 35th district, to which Officers Whitaker and Fletcher had been assigned for four and five years, respectively, had recently received calls from citizens concerning drug activity in the area and the officers were informed of those calls. While conducting surveillance around 11:00 p.m., the officers saw a 2000 Ford Expedition drive around the block three or four times, but never saw any contact between the driver of the vehicle (defendant Martin) and alleged narcotics activity they had witnessed earlier that same day in the same area. The officers observed that the vehicle had New Jersey plates and bore an emblem indicating that it was a rental vehicle. While defendant was driving, his vehicle came face to face with that of the officers.

Thereafter, the officers got out of their vehicle, approached the defendant's vehicle, and, after arriving at the driver side window of the defendant's vehicle, the arresting officers asked the defendant to step out of his vehicle and produce his license.[2] Defendant stepped out of the vehicle on request and thereafter stated that he had no driver's license. A subsequent search of the vehicle found a gun between the console and the driver's seat and numerous rounds of ammunition.

At the suppression hearing, the court held that at the moment that the officers showed their badges to the defendant and asked the defendant to produce his license and exit his vehicle, a stop had occurred because a reasonable person at that point would not have felt free to leave. *Martin,* 155 F.Supp.2d at 384 n. 2. However, "[b]ecause the court [found] that the objective facts, known by the two experienced officers and undisputed by the parties, provide reasonable suspicion for the officers to approach defendant Martin, ask him questions, and request him to exit his vehicle, the court denie[d] defendant Martin's motion to suppress." *Id.*

The court's decision denying the motion to suppress due to an illegal stop was based on its conclusion that a reasonable inference could be made that the individual detained by the police "ha[s] engaged, or will engage, in criminal activity," *id.* (quoting *United States v. Rickus,* 737 F.2d 360, 364 (3d Cir.1984)), based on the following undisputed facts: 1) defendant was driving his vehicle late at night; 2) defendant circled the block three or four times; 3) the area where defendant circled the block was known to the officers as one where there was drug activity; 4) defendant was driving a rented vehicle with out of state tags; and 5) the officers had four and five years experience as Philadelphia police officers. "Although any one of these factors may not on its own raise reasonable suspicion, the court conclude[d] that, taken collectively all of these factors and in light of the circumstances, Officers Whitaker and

---

**2.** At the suppression hearing, there was a factual dispute as to the circumstances surrounding the officer's exit from their unmarked car. However, in its decision denying the motion to suppress, the court found that because the court's opinion that "the arresting officers were justified in stopping the defendant's vehicle is based upon uncontested facts known by the arresting officers

*before* they exited their unmarked police vehicle, the apparent inconsistencies in the arresting officers' testimony need not be reviewed and it is not relevant to the inquiry." *Martin,* 155 F.Supp.2d at 383 n. 1 (emphasis in original) (citing *United States v. Hawkins,* 811 F.2d 210, 215 (3d Cir.1987) (stating Fourth Amendment protects against unreasonable search and seizures not to punish perjury)).

Fletcher were legally justified in asking defendant for his driver's license and requesting that he exit his vehicle." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)) (requiring reasonable suspicion to be based on objective facts considered collectively).

In his motion for a new trial, the defendant argues that in each of the cases the court relies upon to support the five factors above, at least one fact, in itself, was suspicious in nature so that the other innocuous facts took on added significance. Here, the defendant argues, all five factors are innocuous and the officers, therefore, had no basis to conclude that criminal activity was afoot.

█ The court disagrees. None of the cases cited by the court and objected to by defendant require that among the factors upon which the arresting officers base their reasonable suspicion, there must be at least one objectively suspicious factor. Nor does *Terry* mandate this requirement for the legality of a stop. Rather, what *Terry* requires is that reasonable suspicion be based on objective facts considered collectively. 392 U.S. at 21, 88 S.Ct. 1868. In other words, the facts supporting the justification of a *Terry* stop need not be

inherently suspicious in and of themselves so long as all of the facts taken together give rise to a reasonable suspicion that criminal activity is afoot. *Id.* at 22, 88 S.Ct. 1868 (reasonable suspicion may be found by observing "a series of acts, each of them innocent in itself, but which taken together warrant further investigation."). Just recently, the Supreme Court echoed this holding of *Terry* stating that a "particularized and objective basis" for reasonable suspicion may be valid within the meaning of the Fourth Amendment, despite the fact that "each of the[ ] factors alone is susceptible to an innocent explanation." *United States v. Arvizu*, —— U.S. ——, 122 S.Ct. 744, 753, 151 L.Ed.2d 740 (2002). Thus, the court reaffirms its holding that the officers properly had reasonable suspicion to believe that criminal activity was afoot to justify the investigatory stop of defendant.

2) *Probable Cause to Search Defendant's Vehicle*

█ Additionally, defendant argues that even if the court were to determine that reasonable suspicion existed for the investigatory stop of defendant, probable cause did not exist for the search of his vehicle.[3] Defendant is correct that in or-

---

**3.** Defendant did not raise the argument of lack of probable cause to search defendant's vehicle at the suppression hearing or at any time prior to trial. Under Rule 12 of the Federal Rules of Criminal Procedure, a defendant waives a suppression claim if it is not made before trial, *see* Fed. R.Crim. Proc. 12(a)(3), (f), and a court may grant relief from waiver only "for cause shown," *id.* at (f). *See, e.g., United States v. Mendoza–Acevedo*, 950 F.2d 1, 3 (1st Cir.1991) (where defendant's pretrial motion for suppression of confession was based solely on improper initiation of questioning, the issue of voluntariness of the confession, raised on fifth day of trial, deemed waived and the record "show[ed] no reason for the delay that would have permitted the court to grant relief from the waiver."). Here, defendant filed a pretrial motion to

suppress and the court held a suppression hearing. At no point during those proceedings (or at any point through the end of the trial) did defendant assert an argument based upon lack of probable cause to search the vehicle. Thus, defendant waived his right to assert this additional ground for relief.

However, although defendant has not done so, he may have good cause for relief from that waiver if he shows that his prior lawyer failed to raise a potentially reversible argument and could later maintain a motion under 28 U.S.C. § 2255 to vacate, modify or set-aside his sentence based on ineffective assistance of counsel. Thus, although it appears that there was probable cause to search the defendant's vehicle, the court will address the merits of the defendant's argument.

der to search a vehicle, pursuant to the automobile exception to the warrant requirement, probable cause must exist. *Carroll v. United States,* 267 U.S. 132, 156, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

■ The information available to Officers Fletcher and Whitaker at the time that they performed the search of defendant's vehicle was as follows. Once the defendant had exited his vehicle, Officer Fletcher asked him to produce identification. Defendant responded that he did not have identification on him, but was in the process of getting identification in order to obtain a gun permit. Fletcher then asked defendant if he had a gun and defendant responded that he did. Based on this information, Fletcher conducted a protective pat-down of the defendant at which point he learned that the defendant was wearing body armor. As Fletcher was conducting the pat-down, Officer Whitaker came to the rear of the vehicle and reported that he saw, in plain view, among other things, "the top portion of [a] gun" sticking up between the console and driver's seat, cell phones, two-way radios, and an open bag of ammunition. Supp. Hear. Trans., 03/26/01, at 15–16, 66. At that point, the officers performed a full search of the vehicle during which they recovered the drugs at issue in this case. Defendant argues that the officers did not have probable cause to perform this search.

The court finds that based on the foregoing facts that the officers did have probable cause to search the vehicle. The information known to the officers at the time of the search in this case is similar to the facts of *United States v. Rickus,* 737 F.2d 360 (3d Cir.1984). In *Rickus,* the Third Circuit held that probable cause existed to search defendants' vehicle when, during the course of an investigatory stop, the officers learned that 1) neither defendant could produce identification, 2) officers saw a screwdriver, pliers, flashlight and maps

in plain view in the car, 3) defendants' answers to questions about what they were doing were "unsatisfactory," 4) furtive glances between defendants and one defendant's attempt to leave the scene, and 5) a bulge in one defendant's pocket and one defendant was visibly wearing a bullet-proof vest. *Id.* at 366. The information supplied to the officers in *Rickus* was sufficient to conclude that a burglary had been or was about to be committed and these circumstances gave the officers probable cause to search the vehicle. *Id.*

Here, much of the evidence is the same as in *Rickus.* Defendant Martin could not produce identification; the officer's saw the top portion of a gun as well as other indicia of crime in plain view; defendant was wearing body armor; and defendant indicated that he had a gun. While the furtive glances and bulged pockets are not facts in this case, the question of probable cause is "a practical common sense decision whether, given all the circumstances ..., there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The court finds that the circumstances in this case give rise to such a fair probability.

B. *Admission of Expert Testimony as to Defendant's Mental State*

During the course of the trial, the prosecution called Detective Matthew McDonald as a witness who was qualified as an expert "to testify by way of opinion based on his skill, education and experience in the field of narcotic investigations conducted by law enforcement agencies and methods of trafficking of those engaged in narcotics trafficking." Tr. Trans. 6/20/01, at 121. During direct examination, the prosecution asked Detective McDonald the following question: "[H]earing all the evidence and

reviewing the relevant documents and testimony and exhibits, can you form an opinion as to ... whether the amounts of drugs in this case was found [sic] in the lab, 24.49 grams, was consistent with possession with intent to distribute?" In response, Detective McDonald stated, "Yes, sir, I have no doubt that the drugs in this case were possessed with the intent to distribute." *Id.* at 122. Later in the direct examination, the prosecution asked Detective McDonald if the amount of drugs were 2.86 grams [and not 24.49], would his opinion change "as to whether or not there was possession with intent to distribute in this case?"[4] Detective McDonald answered: "[I]f it stood alone, it would be certainly questionable, but due, again, to the totality of the situation, I think that two or three grams would be held for resale also." *Id.* at 127.

Defendant argues that Federal Rule of Evidence 704(b) was violated in this case by the prosecution's questions and McDonald's answers.[5] Defendant relies on the recent Third Circuit case of *United States v. Watson*, 260 F.3d 301 (3d Cir. 2001) which was decided subsequent to the conclusion of the trial in this case. In *Watson*, the Third Circuit stated that "Rule 704(b) may be violated when the prosecutor's question is plainly designed to elicit the expert's testimony about the mental state of the defendant, [*United States v. Boyd*, 55 F.3d 667, 672 (D.C.Cir. 1995)], or when the expert triggers the application of Rule 704(b) by directly referring to defendant's intent, mental state,

or mens rea, *United States v. Lipscomb*, 14 F.3d 1236, 1240 (7th Cir.1994)." *Id.* at 309.

 Defendant claims that although he did not object to the introduction of evidence at trial, as was the case in *Watson*, he is entitled to a new trial because the admission of the allegedly improper evidence as to his state of mind constitutes plain error. *See United States v. Navarro*, 145 F.3d 580, 584 (3d Cir.1998). Rule 52(b) of the Federal Rules of Criminal Procedure states that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Under the plain error standard, "there must be (1) an error; (2) which is clear or obvious; and (3) which affects substantial rights (i.e., it affected the outcome of the district court proceedings)." *Id.* at 584–85 (citing *United States v. Olano*, 507 U.S. 725, 733–34, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) ("Rule 52(b) is permissive, not mandatory.")). If these three requirements of Rule 52(b) are satisfied, the court has discretion to notice a plain error which "(a) causes the conviction or sentencing of an actually innocent defendant, or (b) seriously affect[s] the fairness integrity or public reputation of judicial proceedings." *Navarro*, 145 F.3d at 585 (citing *Olano*, 507 U.S. at 735–36, 113 S.Ct. 1770). The court concludes that in this case, the admission of Detective McDonald's testimony was not error, and that even if it were error, the

---

**4.** Based on the introduction into evidence of conflicting lab reports, there was a dispute at trial as to the exact quantity of the drugs recovered from defendant's car. The jury found beyond a reasonable doubt that defendant was guilty of possession with intent to distribute over five (5) grams of cocaine base.

**5.** Federal Rule of Evidence 704(b) provides that no expert witness:

testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

testimony did not affect the outcome of the proceedings.

Watson involved the prosecution of a defendant for possession of drugs with the intent to distribute. At the time of the arrest, the defendant was found in possession of 2.4 grams of crack cocaine, 7.42 grams of marijuana and 100 small plastic bags. When arrested, the defendant explained that he had taken a trip [to Philadelphia, four hours away by bus], to attend a funeral and that the plastic bags in his possession were for a friend. At trial, the prosecutor called three expert witnesses, including two arresting officers, and made repeated references to the defendant's intent, eliciting the offending responses that the drug in the case "were possess[ed] with the intent to distribute." [6]

The Watson court found that "the Government violated Rule 704(b) by repeatedly eliciting from its experts testimony as to Watson's mental state and the purpose of his actions." Id. at 310.

Unlike Watson, we are not faced with a case, where the prosecutor repeatedly sought to elicit offending testimony concerning the defendant's intent. Rather, here, we face the more subtle question of whether one somewhat oblique reference in a question by the prosecutor and one reference by the expert witness to the defendant's state of mind, when placed in context and under the circumstances of the case, violated the stricture of Rule 704(b).

In analyzing the applicability of Rule 704(b) to a factual setting where the expert has referred to the defendant's state of mind, the Watson court relied on the Seventh Circuit's opinion in United States v. Lipscomb, 14 F.3d 1236 (7th Cir. 1994). In Lipscomb, the court held that:

When a law enforcement official states an opinion about the criminal nature of a defendant's activities, such testimony should not be excluded under Rule 704(b) as long as it is made clear, either by the court expressly or in the nature of the examination, that the opinion is

6. At Watson's trial, the prosecutor asked of the first witness, a narcotics investigator and one of the arresting officers:

... have you formed an opinion, as to whether or not the substance contained in Government Exhibit 1 was possess [sic] with the intent to distribute, transfer or deliver or the intent to personally use that drug?

The witness answered:

I believe it was possess [sic] with the intent to distribute to someone else.

The second expert witness testified that the crack cocaine found on Watson was consistent with someone selling cocaine rather than using it for personal consumption. Then the prosecutor asked of the second witness:

... have you formed an opinion, as to whether or not the substance contained in Government Exhibit 1 was possessed with the intent to distribute, transfer or deliver versus the intent to personally consume that substance?

The witness answered:

Yes, sir. Based on my experience, through my undercover investigations, I've seen, on numerous occasions, subjects that have amounts of crack cocaine like this, as well these packaging bags, which they were cutting off and packaging in these bags for resale, which I've also purchased.

And that would be consistent with someone who is selling cocaine versus someone who would be using it for their personal use.

The third witness, also an arresting officer, was asked by the prosecutor:

... have you formed an opinion as to whether or not that particular trip was taken for the purpose of distribution, transfer and delivery of drugs as opposed to procurement of drugs for personal use?

The witness answered:

Generally, a trip of a short nature like that, a 10–plus hour trip to Philadelphia, spending four hours there, on my experience, has been that they've gone into the city to purchase drugs to, ultimately, take back and resell at their starting point.

Id. at 305–06.

based on the expert's knowledge of common criminal practices, and not on some special knowledge of the defendant's mental processes. Relevant in this regard, though not determinative, is the degree to which the expert refers specifically to the "intent" of the defendant, for this may indeed suggest, improperly, that the opinion is based on some special knowledge of the defendant's mental processes.

*Lipscomb*, 14 F.3d at 1242–43 (upholding convictions where three law enforcement experts testified that the packaging and amount of drugs found on defendant were of the type to be used for street level distribution). Where experts "expressly base[ ] their opinions on analysis of what might be called the external circumstances of [a defendant's arrest], rather than on any purported knowledge of his 'actual mental state,'" there is no violation of Rule 704(b). *Id.* at 1240.

In this case, Detective McDonald's testimony was based on the external circumstances of the defendant's arrest, i.e., the amount of drugs, the possession a certain type of guns which are the weapons of choice of drug dealers, the possession of multiple rounds of ammunition, the fact that the defendant was wearing body armor which acted as a bullet proof vest, use of a rental vehicle, the possession of walkie-talkies, and other indicia consistent with drug distribution. Tr. Trans., 6/20/01, at 122–25. While Detective McDonald did say once that the drugs in this case were "possessed with the intent to distribute," he did not base his opinion on any purported ability to fathom the workings of the defendant's mind or to divine the defendant's subjective intent but rather he made clear that it was predicated upon his evaluation of the totality of the objective circumstances present at the time the defendant was arrested.[7]

Detective McDonald's testimony also must be placed in context. No evidence was introduced at trial that Detective McDonald, unlike two of the expert witnesses in *Watson*, participated in the arrest, or in the investigation, of the case against defen-

---

**7.** After McDonald gave his opinion, the prosecutor asked: "On what basis do you make that opinion?" To which McDonald gave a length response:

"[B]ased on the totality of the circumstances, that being—well, the amount itself, an ounce of crack cocaine is a pretty good amount for an individual to be in possession and I've only seen that kind of amount being possessed with the intent to resell, meaning it would be repackaged, that would be like a wholesale quantity that would be broken down into smaller packets and then resold on the street by someone. Also involved in this case was the possession of a gun, a bullet-proof vest, multiple rounds of ammunition, specifically the AK–47, which is a weapon of choice by many drug dealers on the street—I'm sorry, there was no evidence of a possession of it—well, there was evidence that the gun was purchased and there was 7.62 rounds found in this vehicle involved in this case. The fact that the vehicles are turned over so often, ... [it is] quite popular amongst those in the drug business to keep changing your vehicle so as to remain kind of anonymous. The fact that the vehicle was not leased by the person intending to drive it is another indication ... that it was done to avoid having that person's name on any documents involving that car where contraband was going to be contained. The fact that you have a mask and duct tape indicates that there's some kind of involvement ... in the drug world ... [when] you know that [a] person is a drug dealer, you know that they have large sums of cash or large sums of drugs, so you hide your identity by a mask ... and rob them and take their things.... [The] walkie-talkies seized [are] also consistent with the drug business in today's modern age, the use of two-way radio communications ... that those involved in the organization can communicate with one another, the use of cell phones because they're a little bit more difficult to trace and put a name on, all consistent with the drug trade." *Id.* at 122–24.

dant or in the examination of the drugs seized in this case. In fact, there was no evidence that Detective McDonald ever met or spoke with defendant Martin. Therefore, the jury could not have reasonably concluded that Detective McDonald had some special knowledge of Martin's mental processes. *See Lipscomb*, 14 F.3d at 1242 (danger of prejudice of expert's opinion as to defendant's mental state increased when expert is one of the officers involved in the arrest).

Moreover, both the closing argument in the case and the jury charge were consistent with *Watson*'s general rule that the "defendant's intent is an ultimate issue of fact that the jury alone must decide." *Watson*, 260 F.3d at 310. During its closing, the prosecution noted that Detective McDonald "testified that this packaging is consistent with the wholesale trade and it's [sic] his experience this much crack cocaine is not for personal use. And I think you can use your own common sense in determining whether that's accurate or not." Tr. Trans. 6/21/01, at 32. In its charge to the jury, the court made no reference to Detective McDonald's specific opinions and charged the jury that it had to determine the intent of the defendant by considering all of the facts and circumstances in the case. *Id.* at 97, 106–07. Thus, based on the totality of the circumstances and properly placed in context,

and in the absence of the persistent pattern of improper questions aimed at eliciting state of mind testimony present in *Watson*, it does not appear that Detective McDonald's testimony violated either Rule 704(b) or the *Watson* mandate.

■ Secondly, the court finds that any error in the admission of the McDonald testimony did not affect the outcome of defendant's trial. "In most cases, a court . . . cannot correct the forfeited error unless the defendant shows that the error was prejudicial," *Olano*, 507 U.S. at 734, 113 S.Ct. 1770, or otherwise "affect[ed] substantial rights (i.e. it affected the outcome of the district court proceedings)." *Navarro*, 145 F.3d at 584–85 (citing *Olano*, 507 U.S. at 734, 113 S.Ct. 1770). Defendant has not met this burden.

Here, unlike *Watson*, where the only physical evidence of drug trafficking was defendant's possession of 100 plastic bags, even without Detective McDonald's statement, there was substantial evidence, including the presence of drug paraphernalia consistent with drug trafficking in the car and on the defendant at the time of his arrest, upon which a reasonable jury could find that the defendant possessed the drugs found in his vehicle with the intent to distribute.[8] Thus, the court finds that the defendant has not met his burden of showing that there was plain error which warrants a new trial.[9]

---

**8.** The evidence introduced against Martin at trial consisted of the testimony of Officers Fletcher and Whitaker, who testified as to the circumstances surrounding the investigatory stop (which occurred late at night in an area known for drug activity by two experienced officers) and the subsequent search of defendant and his rented vehicle. The following physical items, which were recovered from defendant and his vehicle as a result of the search, were admitted into evidence: a bag containing a cocaine base substance, a loaded gun directly traceable to the defendant, ammunition, cell phones and walkie-talkies. Additionally, at the time of his arrest, the defen-

dant was wearing body armor which served as a bullet proof vest.

**9.** Because the court finds that there was no error in this case, an even if there were error it did not affect substantial rights of the defendant, the court "need not consider whether the error, if prejudicial, would have warranted correction . . . as 'seriously affect[ing] the fairness, integrity or public reputation of judicial proceedings.'" *Olano*, 507 U.S. at 741, 113 S.Ct. 1770 (quoting *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555 (1936)).

## CONCLUSION

The court finds that the investigatory stop of the defendant was based on reasonable suspicion and the search of defendant's vehicle was justified by probable cause. Thus, the evidence recovered from defendant's vehicle was properly admitted into evidence at trial. Additionally, the court finds that the introduction of the testimony of Detective McDonald was not error. In any event, even if the admission of the testimony was error, it was not plain error. Thus, defendant's request for a new trial will be denied.

An appropriate order follows.

### ORDER

**AND NOW,** this **6th** day of **February, 2002,** upon consideration of defendant's Motion for Post–Trial Relief (doc. no. 76), it is hereby **ORDERED** that the motion is **DENIED** for the reasons stated in the court's memorandum dated February 6, 2002.[1]

**AND IT IS SO ORDERED.**

---

1. The court denied the motion orally from the bench on January 31, 2002.