**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 27 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JIMMY EUGENE RHODES,

Defendant - Appellant.

No. 02-6280
(D. Ct. No. CR-01-202-R)
(W.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **TACHA**, Chief Circuit Judge, **HOLLOWAY**, and **KELLY**, Circuit Judges.

In this appeal, defendant-appellant Jimmy Eugene Rhodes challenges: (1) the district court's denial of his motion to suppress; (2) the sufficiency of the evidence supporting his five counts of conviction; and (3) the constitutionality of 18 U.S.C. § 922(g)(1) under the Second Amendment. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and AFFIRM.

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

## I. Background

### A.  The Traffic Stop[1]

On July 24, 2001, at approximately 1:45 A.M., Officer Robert Ellyson of the Oklahoma City Police Department observed Defendant Rhodes driving a black Chevrolet Camaro at the intersection of 36th and Lindsey in southeast Oklahoma City, Oklahoma. The neighborhood is a mixed residential and business area, known for its high crime rate, specifically its high incidence of auto theft and burglary, home burglaries, rapes, and robberies.  As of the time of these events, Officer Ellyson had patrolled the area in question for his entire career of more than eight years.

During their initial encounter, Rhodes was traveling westbound on 36th Street. Officer Ellyson passed Rhodes and observed that both Rhodes and his male passenger had "startled look[s] on their face[s]," and that Rhodes "grabbed the steering wheel, like in a tense motion."  Following this initial encounter, Rhodes made the first available right turn, heading north into a residential neighborhood.

Officer Ellyson continued his observation of Rhodes' vehicle as it traveled north on Lindsey.[2]  When Rhodes turned eastbound on 33rd Street, Ellyson decided to turn westbound on 33rd Street.  Officer Ellyson testified that Rhodes' vehicle was traveling

---

[1] The evidence seized as a result of the traffic stop relates to Rhodes' convictions under Counts 1 and 2 of the indictment.

[2] Officer Ellyson was also traveling northbound, on a parallel street a few blocks east of Lindsey.

"very slow for normal traffic in that area." As the two cars passed, Officer Ellyson shined a flashlight into Rhodes' vehicle and observed that both Rhodes and his passenger appeared "startled" and "nervous." Both individuals stared straight ahead rather than making eye contact with Officer Ellyson.

At this point, Officer Ellyson turned around in a driveway.[3] Rhodes then pulled over "real quick." Officer Ellyson approached Rhodes' vehicle from behind, at which point, Rhodes pulled away, again heading eastbound on Lindsey. A few moments later, Rhodes turned southbound. At this point, Rhodes had "made a full circle through [the] neighborhood."

Officer Ellyson found Rhodes' behavior "very suspicious." Specifically, Officer Ellyson testified, "We have a lot of auto burglaries there, especially that time of night, and I was concerned that they had committed a crime or were about to." Accordingly, Officer Ellyson decided to run a computer check on the black Camaro to see if it had been reported stolen. Because such checks require an unpredictable amount of time to complete, Officer Ellyson also initiated a "suspicious vehicle stop."

After stopping Rhodes, Officer Ellyson approached the vehicle and inquired about Rhodes' destination. Rhodes responded, "I'm looking for a motel." When Officer Ellyson pointed out that they were in a residential area and that there were no motels close by, Rhodes responded, "Oh, I'm looking for a friend's house." At this point, Officer

---

[3] Officer Ellyson did not turn on his overhead lights.

Ellyson asked Rhodes for his driver's license.

Following a computer check of Rhodes' license, Officer Ellyson received information that there was an outstanding arrest warrant for Rhodes. Based on this information, Officer Ellyson placed Rhodes under arrest. As Rhodes exited the vehicle, Officer Treat, another officer on the scene, observed a magazine containing six rounds of 9 mm hollow-point ammunition on the driver-side seat of the vehicle. The officers later seized the ammunition after impounding Rhodes' vehicle.

After taking Rhodes into custody, Officer Ellyson returned to the point where he had observed Rhodes pulled over to the curb. At that location, Officer Ellyson found a 9 mm pistol on the grass.

Corporal John Jackson processed Rhodes at the Oklahoma County Jail. During processing, Corporal Jackson saw a bag containing a white powdery substance fall from Rhodes' waistband. The substance was later identified as methamphetamine.

B. The Search of Rhodes' Trailer[4]

On August 30, 2001, Shad McFarlane's residence in Choctaw, Oklahoma was burglarized and a number of firearms were stolen. On September 19, 2001, the Choctaw Police Department executed a search warrant for Rhodes' trailer at Shady Side Trailer Park in Choctaw, Oklahoma. During the search, the Choctaw Police recovered: (1) an 8

---

[4] The evidence seized as a result of the search of Rhodes' trailer relates to Rhodes' convictions under Counts 3, 4, and 5 of the indictment. *See* Part I.C., *infra*.

mm DOU bolt-action rifle; (2) a 12-gauge Remington pump shotgun; (3) various types of ammunition; (4) a used syringe that later testified positive for methamphetamine use; (5) a pyrex dish containing a spoon with burnt residue; and (6) lab equipment, chemicals, and other materials used in manufacturing methamphetamines, including muriatic acid, tubing, an HCL generator cap, rock salt, and acetone.

## C.    The District Court Proceedings

On February 6, 2002, a grand jury in the Western District of Oklahoma returned a five-count superseding indictment, charging Rhodes with the following:  (1) possession of a 9 mm semiautomatic pistol[5] and six rounds of 9 mm hollow-point ammunition, in violation of 18 U.S.C. § 922(g)(1) (Count 1); (2) possession of a mixture containing a detectable amount of methamphetamine, in violation of 21 U.S.C. § 844(a) (Count 2); (3) possession of an 8 mm DOU bolt-action rifle, a 12-gauge Remington pump shotgun, a 12-gauge Uzumlu over/under shotgun, eight rounds of 12-gauge shotgun shells, five rounds of 12-gauge shotgun shells with rifled slugs, eighty-three rounds of .40 caliber ammunition, and five rounds of 7.9 mm ammunition, in violation of 18 U.S.C. § 922(g)(1) (Count 3); (4) knowing possession of stolen firearms,[6] in violation of 18 U.S.C. § 922(j) (Count 4); and (5) maintaining an establishment for the purpose of

_____

[5] The jury's conviction on Count 1 was based solely on the possession of the ammunition, not the pistol.

[6]  The stolen firearms included the 8 mm DOU bolt-action rifle, the 12-gauge Remington pump shotgun, and the 12-gauge Uzumlu over/under shotgun.

manufacturing, distributing, and using methamphetamine, in violation of 21 U.S.C. § 856(a)(1) (Count 5).

On April 10, 2002, a jury convicted Rhodes on all five counts. This appeal followed.

## II. Discussion

### A. Whether Officer Ellyson's Stop of Rhodes' Vehicle Was Unreasonable Under the Fourth Amendment.

Rhodes first argues that Officer Ellyson's initial detention of Rhodes was unreasonable under the Fourth Amendment, and that the ammunition and pistol supporting Count 1 and the methamphetamine supporting Count 2 were therefore admitted in contravention of *Wong Sun v. United States*, 371 U.S. 471 (1963). We disagree.

#### 1. *Standard of review*

In reviewing the district court's denial of Rhodes' suppression motion, "we review the district court's factual findings for clear error, viewing the evidence in a light most favorable to the government and considering the totality of the circumstances." *United States v. Callarman*, 273 F.3d 1284, 1287 (10th Cir. 2001). "We review de novo whether those facts provided sufficient justification for a detention." *Id.*

#### 2. *Analysis*

"A traffic stop, however brief, constitutes a seizure within the meaning of the

Fourth Amendment, and is therefore only constitutional if it is 'reasonable.'" *Id.* at 1286

(citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). In considering the reasonableness

of a routine traffic stop, we apply the principles set forth in *Terry v. Ohio*, 392 U.S. 1

(1968). *United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir. 2001) (en banc).

Accordingly, we must determine whether the traffic stop was based on a reasonable,

articulable suspicion of criminal activity. *United States v. Harris*, 313 F.3d 1228, 1234

(10th Cir. 2002). In reviewing reasonable-suspicion determinations, we must consider the

"'*totality of the circumstances*' of each case to see whether the detaining officer ha[d] a

'particularized and objective basis' for suspecting legal wrongdoing." *United States v.

Arvizu*, 534 U.S. 266, 273 (2002) (emphasis added). Reasonable suspicion may exist,

even if "each of the[] factors alone is susceptible to an innocent explanation." *Id.* at 277.

In other words, "[a] determination that reasonable suspicion exists . . . need not rule out

the possibility of innocent conduct." *Id.*

In this case, Officer Ellyson possessed reasonable, articulable suspicion based on

numerous observations. First, when Officer Ellyson initially passed Rhodes' vehicle,

Rhodes and his passenger appeared nervous. Second, Officer Ellyson knew that the

neighborhood had a high rate of auto theft and burglary, especially at night.[7] Third,

Rhodes was driving a Chevrolet Camaro, and Officer Ellyson knew, based on his

---

[7] The incident in question took place at approximately 1:45 A.M.

experience,[8] that such vehicles were commonly stolen in the area. Fourth, Rhodes was traveling at an unusually slow rate of speed. Fifth, Officer Ellyson observed Rhodes quickly turn after their initial encounter, suggesting flight, and a few minutes later, Rhodes quickly pulled over to the curb after Officer Ellyson turned around in a driveway. Sixth, during his surveillance, Officer Ellyson observed Rhodes make a complete circle through the neighborhood. Finally, when Officer Ellyson again encountered Rhodes, he shined a light into the interior of Rhodes' vehicle. In response, both Rhodes and his passenger stared straight ahead, refusing to make eye contact with Officer Ellyson, and both appeared nervous.

Based on these facts, we find that Officer Ellyson had reasonable, articulable suspicion of criminal activity.[9] Accordingly, Officer Ellyson was justified in stopping Rhodes' vehicle. *See Harris*, 313 F.3d at 1234.

### 3. *Conclusion*

Because Officer Ellyson's stop was lawful under the Fourth Amendment, the fruits

---

[8] Officer Ellyson had eight years of law-enforcement experience in this particular area of southeast Oklahoma City.

[9] *Cf. United States v. Miller*, 186 F.Supp.2d 553, 556 (E.D.Pa. 2002) (finding reasonable suspicion based on the following facts: "1) defendant was driving his vehicle late at night; 2) defendant circled the block three or four times; 3) the area where defendant circled the block was known to the officers as one where there was drug activity; 4) defendant was driving a rented vehicle with out of state tags; and 5) the officers had four and five years experience as Philadelphia police officers.").

at issue – the pistol,[10] ammunition, and methamphetamine – were not borne of a poisonous tree.  Accordingly, Rhodes' *Wong Sun* argument fails.

B.      Whether Sufficient Evidence Supported Rhodes' Five Convictions.

Rhodes next contends that the evidence presented at trial was insufficient to support his convictions.  We disagree.

1.      *Standard of review*

"Evidence is sufficient to support a conviction if the evidence and reasonable inferences drawn therefrom, viewed in the light most favorable to the government, would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt."  *United States v. Carter*, 130 F.3d 1432, 1439 (10th Cir. 1997).  "We will not overturn a jury's finding unless no reasonable juror could have reached the disputed verdict."  *Id.*  In reviewing the jury's verdict, we do not consider the credibility of witnesses or weigh conflicting evidence.  *United States v. Pappert*, 112 F.3d 1073, 1077 (10th Cir. 1997).

2.      *Counts 1 and 3:  Possession of six rounds of 9 mm hollow-point ammunition (Count 1) and an 8 mm DOU bolt-action rifle, a 12-gauge Remington pump shotgun, and a 12-gauge Uzumlu over/under shotgun (Count 3)*[11]

---

[10] The jury based its conviction under Count 1 on the ammunition, not the pistol. Thus, Rhodes' argument regarding the pistol is moot.

[11] Count 3 further charged Rhodes with possession of eight rounds of 12-gauge shotgun shells, five rounds of 12-gauge shotgun shells with rifled slugs, eighty-three rounds of .40 caliber ammunition, and five rounds of 7.9 mm ammunition.

To support a conviction under section 922(g)(1), the prosecution must prove the following elements: "(1) the defendant was previously convicted of a felony; (2) the defendant thereafter knowingly possessed a firearm; and (3) the possession was in or affecting interstate commerce." *United States v. Gorman*, 312 F.3d 1159, 1163-64 (10th Cir. 2002) (quoting *United States v. Taylor*, 113 F.3d 1136, 1144 (10th Cir. 1997)).

Rhodes' challenge here, for both Counts 1 and 3, is limited to the evidence relating to the second element's "knowing possession" requirement. In considering the evidence necessary to satisfy this requirement we have previously held that "[t]he Government may meet its burden of proof [under § 922(g)(1)] by showing constructive possession; actual possession is not required." *United States v. Hien Van Tieu*, 279 F.3d 917, 922 (10th Cir. 2002). "To establish constructive possession, the Government must show the defendant 'knowingly holds the power to exercise dominion or control over the firearm.'" *Id.* (quoting *United States v. Heckard*, 238 F.3d 1222, 1228 (10th Cir. 2001)).

### a. Count 1

In this case, Officer Treat observed the ammunition clip on Rhodes' seat, just as Rhodes exited the vehicle.[12] Further, Rhodes' brother-in-law, Cody Lowry, testified that Rhodes had told him that the 9 mm ammunition clip was "either under the seat or in the

---

[12] *See Gorman*, 312 F.3d at 1164 ("[S]ufficient nexus between [defendant] and the firearm was established by testimony describing the location of the gun on the driver's side of the vehicle and demonstrating it was visible and retrievable from the driver's seat, where [defendant] was sitting immediately prior to the search.").

console" at the time of the traffic stop.  Thus, under the constructive possession standard articulated above, sufficient evidence supported the jury's finding that Rhodes knowingly possessed the 9 mm ammunition in Count 1.

b.      Count 3

Rhodes similarly asserts that the evidence presented at trial was inadequate to support the "knowing possession" element of his conviction on Count 3.  This argument is without merit.

The Choctaw Police discovered the 8 mm DUO bolt-action rifle, the 12-gauge Remington pump shotgun, and the various types of ammunition while executing a search warrant for Rhodes' trailer home.  Contrary to Rhodes' contention, sufficient evidence connected Rhodes to the trailer, including the following:  (1) Rhodes used his own key to unlock the trailer door for the officers executing the search warrant; and (2) testimony from three witnesses, all of whom testified that Rhodes lived in the trailer until at least two or three days prior to the day the Choctaw Police executed the search warrant. Further, Lowry testified that Rhodes had offered to sell him the firearms in question in September 2001.  Regarding the 12-gauge Uzumlu over/under shotgun, three witnesses testified to Rhodes' possession of the firearm:  Lowry, Joey Johnson, and Bob Johnson.

c.      Conclusion

Based on the above, we conclude that sufficient evidence supported the jury's convictions on Counts 1 and 3.

- 11 -

### 3. *Count 2: Possession of methamphetamine*

Sufficient evidence also supported Rhodes' conviction under 21 U.S.C. § 844(a). Section 844(a) provides: "It shall be unlawful for any person knowingly or intentionally to possess a controlled substance." 21 U.S.C. § 844(a).

Corporal John Jackson testified that he witnessed a small plastic packet containing a white powdery substance fall from Rhodes' pants while Rhodes was being processed at the Oklahoma County Jail.[13] Oklahoma City Forensic Chemist Matthew Scott testified that the substance was methamphetamine. Thus, sufficient evidence supported Rhodes' conviction under Count 2.

### 4. *Count 4: Possession of stolen firearms*

The firearms supporting Count 3 also supported Count 4: (1) an 8 mm DUO bolt-action rifle; (2) a 12-gauge Remington pump shotgun; and (3) a 12-gauge Uzumlu over/under shotgun.[14] Lowry testified that Rhodes admitted to him that he had

---

[13] Lowry's testimony corroborated Corporal Jackson's testimony. Lowry testified as follows:

> [Rhodes] said that . . . he also had some cocaine in his possession when they took him down to – or crank. I think it was cocaine.
>
> . . . .
>
> [Rhodes] told me, when they took him downtown and put him in a holding cell, he opened up the bag of drugs and spread them out across the cell in the holding cell where he wouldn't get caught with them.

[14] Concerning the possession element of Count 4, see section II.B.2.b., *supra*.

burglarized the residence of Shad McFarlane and stolen the weapons in question. Accordingly, sufficient evidence supported the jury's conviction on Count 4.

5. *Count 5*

21 U.S.C. § 856(a)(1) makes it unlawful to "knowingly open or maintain any place for the purpose of manufacturing, distributing, or using any controlled substance." Sufficient evidence supported Rhodes' conviction under section 856(a)(1).

First, the Choctaw police seized numerous items necessary for the production and use of methamphetamine from Rhodes' trailer. Second, Candice Bird, Rhodes' live-in girlfriend, and Cody Lowry, Rhodes' brother-in-law, both testified to seeing lab equipment and other materials necessary for methamphetamine production in Rhodes' trailer.[15] Third, Bird had actually witnessed Rhodes producing methamphetamine in his trailer. Fourth, Bird and Lowry both testified that Rhodes had admitted to manufacturing a controlled substance in his trailer. Finally, both Bird and Lowry had observed Rhodes using methamphetamine in his trailer. Thus, sufficient evidence supported Rhodes' conviction under Count 5.

C. Whether 18 U.S.C. § 922(g)(1) Is Unconstitutional Under the Second Amendment.

In *United States v. Baer*, we upheld the constitutionality of 18 U.S.C. § 922(g)(1)

---

[15] Bird testified that she personally had obtained for Rhodes "speed" pills necessary for the production of methamphetamine.

under the Second Amendment. 235 F.3d 561, 564 (10th Cir. 2000). Under *United States v. Killion*, this three-judge panel may not reconsider the question. 7 F.3d 927, 930 (10th Cir. 1993) ("We are bound by the precedent of prior panels absent *en banc* reconsideration or a superseding contrary decision by the Supreme Court.").

III. Conclusion

Based on the foregoing, we AFFIRM.

ENTERED FOR THE COURT,


Deanell Reece Tacha
Chief Circuit Judge